In re James M. WATSON, Dorothy B. Watson, Debtors.

Bankruptcy No. 2–88–02356.

United States Bankruptcy Court, S.D. Ohio, E.D.

Dec. 12, 1988.

Charles W. Ewing, Charles W. Ewing Co., L.P.A., Columbus, Ohio, for debtors and debtors in possession.

Leon Friedberg, Benesch, Friedlander, Coplan & Aronoff, Columbus, Ohio, for Agristor Leasing–II.

Frank M. Pees, Worthington, Ohio, Chapter 12 Trustee.

Michelle T. Sutter, Baker & Hostetler, Columbus, Ohio, for Chapter 12 Trustee.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER

R. GUY COLE, Jr., Bankruptcy Judge.

This matter is before the Court on the "Motion of Agristor Leasing–II to (1) Disqualify Debtors' Attorneys; (2) Order Non-Compensability of Debtors' Attorneys; (3) Order Court Examination of Debtors' Transactions With Attorneys and To Determine Excessive Payment; and (4) To Have Lien Set Aside" (hereinafter "Motion"). James and Dorothy Watson, the debtors and debtors in possession ("Debtors") in this Chapter 12 case, oppose the Motion and request, by separate application, appointment *nunc pro tunc* of Charles W. Ewing ("Ewing") as their counsel. An evidentiary hearing was held on October 6, 1988, to consider the first two branches of the Motion, to wit: the requests for disqualification of Debtors' counsel and determination of noncompensability.

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this judicial district. This is a core proceeding upon which this Court may enter a final order. 28 U.S.C. § 157(b)(1) and (2)(A). The following opinion shall constitute the

Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## I. *Findings of Fact*

The facts necessary to a decision by this Court are essentially undisputed. Following graduation from law school in 1983, Ewing commenced his private law practice in Columbus, Ohio, under the name Charles W. Ewing Co., L.P.A. Ewing first met the Debtors in 1983 or 1984 through his association with farmers. Debtors engaged Ewing at that time to represent their interests as guarantors, as well as their sons' interests as primary obligors, on a defaulted promissory note held by Farmers Home Administration. Ewing represented the Debtors without compensation until April 1985, at which time he required Debtors to pay him $200 per month to defray some of the costs and expenses incurred in representing them on various matters, including a foreclosure action commenced by Metropolitan Life Insurance Company ("Metropolitan") on Debtors' real property; a minor criminal action involving one of Debtors' children; and a lawsuit filed in 1985 in the district court by Agristor Leasing–II ("Agristor") against Debtors for, *inter alia,* damages based upon Debtors' alleged default under a certain Agricultural Equipment Lease ("Lease"). Actual payments made to Ewing from April 1985 through April 6, 1988, totaled $7,000.

On February 29, 1988, Agristor's lawsuit against Debtors proceeded to trial. On March 4, 1988, the jury rendered its verdict in favor of Agristor and awarded the sum of $71,663.77 as damages for Debtors' breach of the Lease. The jury also found that James Watson had committed fraud in connection with the Lease. The jury's verdict was entered in the court's official judgment records on March 7, 1988.

During the course of the trial, Ewing advised the Debtors that his legal fees for services provided to them with respect to the trial and any appeal could approach $50,000. Ewing also believed he was owed an undetermined sum of money for services rendered between 1983 and March 1, 1988. In an effort to obtain a substantial payment on Debtors' account, and to secure the payment of existing and prospective fees, Ewing advised Debtors that he intended to apply against Debtors' account several checks which Debtors had delivered to him in December 1987 or January 1988. These checks, totaling $18,935.89, and made payable to Ewing, were deposited into Ewing's law firm account on March 3, 1988. Ewing had held the checks for several months while he was attempting to settle extrajudicially the Debtors' dispute with Agristor. Had the dispute been settled in the amounts apparently contemplated by Debtors, there would have been some unspecified portion of the $18,935.89 available to pay Ewing's legal fees. Ewing did not provide—and, in fact, was unable to construct—a statement of Debtors' account at that time. Accordingly, he simply applied the $18,935.89 against whatever undetermined amount Debtors owed him on their account.

Ewing also requested and obtained a security interest on March 1, 1988 in the following personal property (the "Collateral") of the Debtors:

> All Inventory, accounts receivable, contract rights, equipment, livestock and the proceeds thereof, including all tangible and intangible assets of any kind or nature, now owned or hereafter acquired, all livestock, all crops now growing, grown, or stored, including all government payments. Crops to be grown on the following property:
>
> 207 acres 5 miles NE of Marysville Titled to Metropolitan Life.

The security agreement purported to secure payment of indebtedness "up to $60,-000 as provided in the note or notes herewith," (Agristor Ex. 2) although Ewing does not recall preparing a note or asking Debtors to sign one. Ewing also required Debtors to execute a UCC–1 financing statement so as to perfect, after filing with the appropriate governmental authorities, his interest in the Collateral. James Watson believed that the Collateral secured the payment of attorney's fees incurred subsequent to March 1. Ewing apparently believed the security agreement covered ser-

vices provided in connection with the trial and any appeal, including services provided in the two months prior to trial.

As of the petition and hearing dates, Ewing was unable to determine the amount of his claim or claims for unpaid legal services. His predicament results, in part, from the loose compensation arrangement that exists between him and the Debtors. Although Ewing believes he advised Debtors in 1987 that their payments were lagging far behind their account balance, he never calculated the amount they owed him. Neither Ewing nor Debtors are able to estimate Ewing'S claim for attorney's fees, although Ewing contends that he has original diary entries for the past five years which are in the process of being reprinted and programmed into his new office computer.

Irrespective of the unorthodox accounting and billing procedures practiced by Ewing on Debtors' account, Ewing clearly asserts a claim against the estate, unknown in amount, for nonbankruptcy services he provided on Debtors' behalf prior to March 1, 1988, and for bankruptcy and nonbankruptcy services rendered subsequent to March 1, 1988. While Ewing's testimony is inconsistent as to whether he contends that the security interest is intended to cover unpaid fees for nonbankruptcy services provided prior to March 1, there is no doubt that he has such a claim considering his testimony that the security interest extends to services provided in the month or two preceding the district court trial.

On May 6, 1988, Debtors filed their voluntary petition under Chapter 12 of the Bankruptcy Code, listing Agristor and Metropolitan as their only creditors. They later added Ewing—whose claim is listed as secured and unknown in amount—and Cooper Communities, Inc. in their schedules filed on May 20, 1988. Metropolitan and Debtors have agreed to a modification of the stay which effectively removes Metropolitan as a creditor entitled to distributions under any plan that may be confirmed by the Court. The claim of Cooper Communities, Inc., in the amount of $3,138, is for monies owed by Debtors under a time-share agreement and it appears that the monthly payments of $69.20 required by Debtors' contract with this creditor will continue as provided in the contract. The only remaining creditor is Agristor.

Ewing has served as Debtors' sole post-petition counsel but made no effort to obtain court appointment until September 13, 1988, when, following the filing of the Motion, he filed his Application for Appointment of Attorney ("Application"), Compensation Statement of Attorney for Debtor ("Compensation Statement"), and an Affidavit of Proposed Legal Professional Association To Be Under General Retainer. On September 15, 1988, a second Affidavit of Proposed Legal Professional Association To Be Under General Retainer ("Affidavit") was filed by Ewing. The Application represents "that the Debtors-in-Possession have given a security interest in their livestock, crops, and equipment as a general retainer to secure payment of contemporaneous services as were performed by counsel for Debtors, prior to bankruptcy and for such services as may be performed for Debtors-in-Possession as may be allowed by this Court." (Application at 2–3) The Compensation Statement sets forth a $125 hourly fee, but makes no mention of the security agreement. The Affidavit asserts that Ewing is disinterested as that term is defined in the Code. The Application is opposed by Agristor on numerous grounds.

Ewing concedes that he holds a prepetition claim, undetermined in amount, for unpaid legal fees rendered with respect to bankruptcy and nonbankruptcy matters. He further acknowledges that he has never prepared or submitted to Debtors a bill, invoice or other statement of their account. As support for his request to be appointed *nunc pro tunc*, Ewing cites his thorough familiarity with the Debtors' business and financial affairs. The Court's refusal to appoint him as counsel, Ewing argues, would require Debtors to obtain substitute counsel who would have to familiarize himself with the Debtors' affairs at great expense to the Debtors and the estate.

## II. *Conclusions of Law*

The primary issue before the Court is whether Ewing's prepetition security interest in virtually all of the Debtors' assets, taken to secure payment of fees for bankruptcy and nonbankruptcy services, disqualifies him from serving as their counsel in this Chapter 12 case. A secondary issue is whether the Court should authorize compensation to Ewing for postpetition legal services provided to the Debtors.

■■■ It is undisputed that trustees should be permitted to select their own attorney without interference from others. *See In re Magna Prod. Corp.*, 251 F.2d 423 (2d Cir.1957); *Matter of Market Response Group, Inc.*, 20 B.R. 151 (Bankr.E.D.Mich. 1982) (holding that only in the rarest cases will the trustee [or debtor in possession] be deprived of the privilege of selecting qualified counsel since the relationship between them is highly confidential, demanding personal faith and confidence in order that they may work together harmoniously). Trustees do not, however, have unfettered discretion in their choice of counsel—the Code expressly subjects the selection to court approval. Section 327(a) of the Bankruptcy Code specifies the conditions upon which professional persons may be employed by the trustee:

> ... [T]he trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, ...

Although § 327(a), by its terms, refers to "the trustee," 11 U.S.C. § 1107(a) makes § 327(a) applicable to attorneys appointed to assist in possession. *See Matter of Triangle Chemicals, Inc.*, 697 F.2d 1280 (5th Cir.1983). A debtor in possession stands in the shoes of a trustee in every way. S.Rep. No. 989, 95th Cong., 2d Sess. 116, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5902, *Triangle Chemicals*, 697 F.2d at 1284. Thus, the attorney for the debtor in possession must meet the requirements of § 327(a) in obtaining counsel. *Matter of Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr.S.D.N.Y.1981).

Section 327(a) imposes a two-part test upon attorneys—and other professionals—seeking appointment. The attorney must be a disinterested person and cannot hold or represent an interest adverse to the estate. While the Code has left undefined the contours of the phrase "interest adverse to the estate," a disinterested person is defined in the Code as one who:

> (A) is not a creditor, an equity security holder, or an insider; ...
>
> ....
>
> (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ... or for any other reason,

11 U.S.C. § 101(13). Because a "creditor" is defined at § 101(9)(A) as "an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor; ..." a strict interpretation of § 327(a) would bar any counsel from appointment who asserted a claim for any services provided to the debtor prior to the filing of the petition. Under such a reading of § 327(a), an attorney who merely assisted the debtor in preparing its bankruptcy petition and accompanying papers would be a "creditor" and therefore barred from appointment because of a lack of disinterestedness. In an effort to avoid such an obviously ludicrous result, most courts have concluded that performance of customary prepetition bankruptcy services, *i.e.*, preliminary work routinely undertaken to facilitate an upcoming bankruptcy filing, does not make the attorney a creditor under § 101(13) and will not serve to disqualify an otherwise eligible attorney from appointment under § 327(a) absent the presence of other disqualifying factors. *See, In re Roberts*, 46 B.R. 815, 849 (Bankr.D. Utah 1985).

■■■ The bankruptcy court's reasoning in *Roberts* reflects a realistic interpretation of § 327(a) and the legislative history behind it. Thus, the Court believes that an

attorney holding a prepetition claim for bankruptcy services is not barred *per se* by 11 U.S.C. § 327(a) from appointment as counsel to the trustee or debtor in possession. Likewise, the retention of a prepetition security interest in the debtor in possession's assets, to secure payment of fees generated for bankruptcy services, is not, *per se*, a disqualifying factor under § 327(a). *See, In re Martin,* 817 F.2d 175, 165 B.C.D. 112 (1st Cir.1987). *See, also, In re Automend, Inc.,* 85 B.R. 173 (Bankr.N. D.Ga.1988).

On appeal to the First Circuit Court of Appeals in *Martin* was the bankruptcy and district court's decision that a law firm, with a prepetition note and mortgage to secure payment of bankruptcy fees, was disqualified *per se* by virtue of its position as a creditor under § 327(a). The *Martin* court rejected application of a *per se* rule as inflexible and made the following, cogent observation about § 327(a):

> At first blush, this statute would seem to foreclose the employment of an attorney who is in any respect a "creditor." But, such a literalistic reading defies common sense and must be discarded as grossly overbroad. After all, any attorney who may be retained or appointed to render professional services to a debtor in possession becomes a creditor of the estate just as soon as any compensable time is spent on account. Thus, to interpret the law in such an inelastic way would virtually eliminate any possibility of legal assistance for a debtor in possession, except under a cash-and-carry arrangement or on a *pro bono* basis. It stands to reason that the statutory mosaic must, at the least, be read to exclude as a "creditor" a lawyer, not previously owed back fees or other indebtedness, who is authorized by the court to represent a debtor in connection with reorganization proceedings—notwithstanding that the lawyer will almost instantaneously become a creditor of the estate with regard to the charges endemic to current and future representation.

817 F.2d at 180, 16 B.C.D. at 116 (citations omitted).

Instead, when determining under § 327(a) the qualifications of an attorney who has obtained a security interest in the debtor's assets as a guaranty of payment, the court of appeals suggested a case-by-case review by the bankruptcy court of the following nonexhaustive list of factors:

1. the reasonableness of the arrangement and whether it was negotiated in good faith;

2. whether the security demanded was commensurate with the predictable magnitude and value of the foreseeable services;

3. whether it was a needed means of ensuring the engagement of competent counsel;

4. whether or not there are telltale signs of overreaching;

5. the nature and extent of any conflict arising from the taking of a security interest as well as the likelihood that a potential conflict might turn into an actual one;

6. the influence the putative conflict may have in subsequent decisionmaking;

7. how the matter likely appears to creditors and to other parties in legitimate interest, given the importance of perceptions by the creditor body and the problem at large;

8. whether the existence of the security interest threatens to hinder or to delay the effectuation of a plan;

9. whether the security interest granted is (or could be perceived as) an impediment to reorganization;

10. whether the fundamental fairness of the proceedings might be unduly jeopardized either by the actuality of the arrangement or by the reasonable public perception of it.

817 F.2d at 182, 16 B.C.D. at 117–18. The bankruptcy court must, therefore, consider the "full panoply of events and elements" surrounding the taking of a security interest by a professional person seeking to be retained as counsel. *Martin,* 817 F.2d at 182, 16 B.C.D. at 117.

This Court concludes, from its review of § 327(a) and *Martin,* that the bankruptcy

court should examine the totality of the circumstances on a case-by-case basis. The *Martin* factors are certainly assistive in that review. This Court will be ever mindful of the spirit of § 327(a), *i.e.*, that the requirement of disinterestedness and lack of adverse interest are intended to address not only actual and potential conflicts, but also the appearance of impropriety or conflict irrespective of the integrity of the person or firm under consideration. A disinterested person should be divested of any scintilla of personal interest which might be reflected in the attorney's decision concerning estate matters. *In re Codesco*, 18 B.R. 997, 999 (Bankr.S.D.N.Y.1982) ("[t]here should be no opportunity for the exercise of conflicting interests or the appearance that dual loyalty may exist"); *Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1256 n. 6 (5th Cir.1986) ("standards for employment of professional persons are strict, for Congress has determined that strict standards are necessary in light of the unique nature of the bankruptcy process"); *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 334 (Bankr.E. D.Pa.1982) (professionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might reflect in their decisions concerning matters of the estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration).

However, § 327(a) will not support, by either its terms or objectives, a bright-line rule precluding an attorney at all times and under all circumstances from taking a security interest to safeguard the payment of his fees. *See, e.g., In re Martin*, 817 F.2d at 181, 16 B.C.D. at 117. In the final analysis the Court must assess the nature of the interest taken and determine the existence of either an actual or potential conflict, or the perception of one, that renders the attorney's interest materially adverse to the debtor, the estate or the creditors. *See, In re Guy Apple Masonry Contractor, Inc.*, 45 B.R. 160, 166 (Bankr.D. Ariz.1984). The court's inquiry is of necessity case-specific; thus, each situation must be judged prospectively on its own merits

in light of the totality of the circumstances presented.

■ In the instant case, Ewing's status as a creditor holding a prepetition security interest in Debtors' assets, taken as security for the payment of fees for prepetition nonbankruptcy work, disqualifies him from appointment under § 327 and from continuing as Debtors' unappointed Chapter 12 counsel. As noted above, the taking of a prepetition security interest to secure payment of legal fees arising from prepetition bankruptcy services will not, standing alone, disqualify counsel under § 327(a). The Court recognizes the need for pre-filing consultation by prospective debtors with their chosen counsel and counsel's corresponding desire to protect his legal fees by obtaining a security interest in the debtor's assets. Many cash-short debtors would be unable to obtain counsel absent their ability to give an attorney a security interest in noncash prepetition property. Nonetheless, the courts are nearly uniform in the conclusion that a prepetition security interest in the debtor's assets taken to secure payment of fees for prepetition *nonbankruptcy* services renders the attorney a creditor within the meaning of 11 U.S.C. §§ 101(13) and 327(a) and thereby disqualifies him. *See, e.g., In re Pierce*, 809 F.2d 1356 (8th Cir.1987); *In re Automend*, 85 B.R. at 176; *In re Roberts*, 46 B.R. at 849.

In *Automend*, the bankruptcy court found that the taking of a security interest in the debtor's accounts increased the likelihood of a potential conflict turning into an actual one, considering the possibility that counsel might eventually "raid" the accounts of the cash-short debtor. *Automend*, 85 B.R. at 177. Here, the fact that Ewing took a security interest in Debtors' accounts and all of their remaining Collateral, in the midst of trial in the district court and without ever billing Debtors or informing them of their account balance, resulted in alienation of all Debtors' assets from the reach of their principal creditor, Agristor, without any clear support for such an all-encompassing encumbrance. Under the facts adduced in the instant case, the Court finds that Ewing's conduct,

and his secured prepetition claim for bankruptcy and nonbankruptcy work, render him not disinterested and materially adverse to the interests of the estate, the creditors, and the Debtor. Specifically, the Court concludes that the March 1 and 3 transactions, *i.e.*, the grant of a security interest in all of Debtors' Collateral up to $60,000 and the deposit by Ewing of $18,935.89 in his law firm account, were not reasonable as to the amounts deposited or pledged. Moreover, the Court cannot conclude that this arrangement was negotiated in good faith. Indeed, given the dire circumstances facing Debtors and their obvious need for Ewing's continued representation in the district court case, it seems apparent that Debtors had little choice than to accede to Ewing's proposed fee arrangement. Further, no showing by Ewing was made that the amount of the Collateral taken was commensurate with foreseeable services or that such an all-encompassing security agreement was required for Debtors to obtain competent counsel. Further, the taking during trial of such an expansive security interest from relatively unsophisticated clients facing the loss of all or most of their real and personal property suggests overreaching on Ewing's part. Finally, there can be no doubt that an actual conflict exists between Ewing and the estate; that the perception of creditors and other parties is that Ewing holds a materially adverse interest to them, the estate, and the Debtors; that Ewing is not disinterested; that the security interest is perceived as an impediment to reorganization; and that the fundamental fairness of the proceeding—or its perception—is unduly jeopardized.

Perceptions are not unimportant. Even if no actual conflict or impropriety existed here, the appearance of both a conflict and impropriety, combined with questionable conduct under the ethical canons governing lawyers, would disqualify Ewing. While the Debtors are in no position to openly criticize Ewing, the Court is persuaded by the record that Ewing's conduct has lessened the parties'—including the Debtors'—confidence in the bankruptcy process and perhaps the legal system as a whole.

While acceptable reasons may exist for Ewing's conduct, they were not offered by Ewing in opposition to the Motion. Had Ewing retained independent counsel to represent him in this matter, instead of representing himself, it is likely that a more thorough and objective defense would have been presented. Predictably, Ewing's representation of himself proved the wisdom of a venerable maxim about attorneys representing themselves. While the Court does not in any way impute impure motives to Ewing, the record made at the hearing portrays his handling of Debtors' account in a less-than-favorable light.

The courts are absolutely uniform as to one command: the bankruptcy court *must* —no matter how unpleasant a task it may be—ensure the integrity of the bankruptcy process. The interests of maintaining public confidence in the bankruptcy system must prevail. *See, Kraft, Inc. v. Alton Box Board Co.*, 659 F.2d 1341, 1348–49 (5th Cir.1981); *Matter of Cropper*, 35 B.R. 625, 632 (M.D.Ga.1983). Here, Ewing's conduct has assailed the integrity of the bankruptcy system. His lack of full disclosure, and his belated filing of an application for appointment some four months after the filing of the petition, do not meet the minimum requirements of § 327(a). As noted by the court of appeals in *Martin:*

> What counts is that the matter not be left either to hindsight or the unfettered desires of the debtor and his attorney, but that the bankruptcy judge be given an immediate opportunity to make an intelligent appraisal of the situation and to apply his experience, common sense, and knowledge of the particular proceeding to the request. If a lawyer is desirous of benefiting from such an arrangement, he has a responsibility to leave no reasonable stone unturned in bringing the matter to a head at the earliest practical moment.

817 F.2d at 182. Such disclosure did not occur in the instant case. To the contrary, the Application states that a security interest was taken in Debtors "livestock, crops, and equipment" when, in fact, the security interest, by its very terms, covers all of

Debtors' personal property, including inventory, accounts receivable, contract rights, government payments, and "all tangible and intangible assets of any kind or nature." Thus, the Application does not advise the Court fully of the nature and scope of Ewing's interest in Debtors' prepetition assets. . Further, Ewing's reference to the prepetition legal services he provided, both bankruptcy and nonbankruptcy, is cursory and utterly devoid of material detail. Clearly, then, Ewing did not take the steps necessary to bring the issue of his qualification to serve as counsel to Debtors to the attention of the Court in a timely or thorough manner. His failure to do so heightens the appearance of impropriety.

The Court appreciates the obstacles which Debtors may face in their search for substitute bankruptcy counsel, particularly considering their past reliance on Ewing and their limited funds to pay counsel. Nor does the Court question Ewing's personal and professional commitment to represent the Debtors zealously in their legal disputes with Agristor or in their attempt to rehabilitate their financial affairs. Nonetheless, and without casting any aspersions on Ewing's professionalism or abilities, the Court still must conclude that he is not qualified for appointment under § 327(a). The Court would note, parenthetically, that Agristor has challenged the eligibility of James Watson, age 62, and Dorothy Watson, age 55, to serve as Chapter 12 debtors and whether they have filed this case in good faith. Both Agristor and the Chapter 12 trustee question the plan's feasibility. A cursory review of the Court file, including the trustee's report and recommendation, suggests that these alleged deficiencies, and others, must be carefully reviewed and analyzed by substitute counsel before undertaking representation of Debtors or recommending their continued prosecution of this Chapter 12 case.

Accordingly, the Court SUSTAINS branch one of the Motion and disqualifies Ewing from serving as unofficial or official counsel to the Debtors. The Application for appointment is DENIED, including Ewing's request for *nunc pro tunc* appointment, on the ground that Ewing is not qualified to be employed under 11 U.S.C. § 327(a) as attorney for the Debtors.

As for the second branch of the Motion, the Court *may* deny allowance of compensation and reimbursement of expenses of professionals who are not disinterested or who hold an interest adverse to the interest of the estate. *See* 11 U.S.C. § 328(c). Because Ewing has not requested compensation for services or reimbursement of expenses, consideration of branch two is premature. Nevertheless, the Court will not definitively foreclose the possibility that Ewing may be entitled to some compensation and expense reimbursement for bankruptcy services upon proper application to the Court.

As for branches three and four, the Court will await a further request by the parties with respect to discovery or other appropriate action.

IT IS SO ORDERED.