### In re SEEBURG PRODUCTS CORP., Debtor.

**Bankruptcy No. 97 B 25199.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Dec. 9, 1997.

Harold L. Moskowitz, Chicago, IL, for Respondents.

Kevin M. Brill, Chicago, IL, for Movant.

Roman Sukley, Dept. of Justice, Chicago, IL, for U.S. Trustee.

Stephen T. Bobo, D'Ancona & Pflaum, Chicago, IL, for Trustee.

Alex Moglia, Schaumburg, IL, trustee.

### MEMORANDUM OPINION

RONALD BARLIANT, Bankruptcy Judge.

On October 1, 1997, more than a month after the chapter 11 case had been commenced, the Debtor presented a motion to

employ attorney Kevin Brill to represent it.[1] By then, a great deal had happened in the case, with Mr. Brill representing the Debtor (even though the Debtor had not yet been authorized to employ him). An objection to that motion was filed by Maritza Marrero. The Court heard the arguments of counsel, and, on the basis of those arguments and the prior proceedings in the case, found that Mr. Brill is not qualified to represent the Debtor and denied the application. The specific deficiencies in Mr. Brill's conduct that led to the Court's finding include his:

♦ Failure to ensure compliance with the fiduciary obligations and other duties imposed upon a debtor-in-possession, including, failure to obtain approval for post-petition financing and the use of cash collateral.

♦ Inaccurate statements made in schedules and other pleadings.

♦ Repeated disregard for this Court's scheduling orders that resulted in sanctions being entered against his client.

♦ Unwarranted obstruction of discovery and failure to timely disclose information that should have been disclosed in discovery.

More generally, in the context of this unusual case, Mr. Brill's conduct left this Court with the firm conviction that he could not be trusted to counsel this Debtor in accordance with the fiduciary requirements of a debtor in bankruptcy. As discussed below, this Debtor came into chapter 11 under a dark shadow; it was accused of being the vehicle for the unlawful appropriation of the assets of another firm. If it had a valid reason to seek chapter 11 relief, it needed to quickly reveal that reason and show that it was a legitimate business with nothing to hide. Instead, Mr. Brill continued the pattern of evasion that the Debtor had followed before bankruptcy. In order to fully explain the reasons for the Court's decision, and to explain why even otherwise trivial-seeming transgressions of rules and orders had greater significance in this case, it is necessary for the Court to begin with a discussion of the pre-bankruptcy history of the Debtor.

## BACKGROUND [2]

This case was commenced on August 18, 1997, by the filing of a voluntary petition under chapter 11 of the bankruptcy code.[3] At the time of the filing, the Debtor was the in the midst of a hearing in the Circuit Court of Cook County on a request to enjoin the Debtor from using the names "Seeburg" and "Jukebox" in its business. That lawsuit involved the Debtor, its president Omar Haque and several members of the Haque family on one side, and a company in the same business as the Debtor, Jukebox U.S.A., Inc. ("Jukebox"), Maritza Marrero, Patricia Carlo, Nelson Carlo and Jack Kapala ("Petitioners"), on the other. The filing of the chapter 11 petition was apparently an attempt by the Debtor to stay that litigation.

For the most part, Mr. Brill did not represent the Debtor in the state court litigation; he was not retained by the Debtor until approximately two weeks prior to the filing of the petition. Mr. Brill is not, therefore, responsible for the manner in which the state court litigation was conducted. However, in order to fully understand the bankruptcy proceedings, and the Debtor's conduct here, it is necessary to understand the claims made in the state court litigation and the manner in which the Debtor conducted that action.

### The State Court Litigation

The state court litigation began as an action by Shuja Haque, Omar's father, against David Andalcio and Patricia Marrero to establish that he and Marrero were the only shareholders of Jukebox. Shuja Haque was a principal of Jukebox and held a patent on a particular type of jukebox. On December 5, 1996, while that litigation was pending, the

**1.** This case was filed as a chapter 11; a trustee was appointed in the chapter 11 case. It has since been converted to a chapter 7.

**2.** The facts discussed below are derived from the pleadings in this case and the related adversary proceeding, the state court papers of which copies have been filed in this Court, and the testimo-

ny at the hearing on the motion for the appointment a trustee.

**3.** 11 U.S.C. §§ 1101, et.seq. All statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101, et.seq., unless otherwise indicated.

Debtor was incorporated. For the first six months of its business, the Debtor operated out of a location previously used by Jukebox. Both companies manufactured the same type of jukebox, known in the trade as a "Seeburg" jukebox.[4] In fact, the Debtor used the same phone and fax numbers as that previously used by Jukebox.

This action precipitated the filing of a third party complaint and counterclaim against the Debtor, Shuja, Omar, Mary Haque, and Farouk Haque, by the Petitioners.[5] The Petitioners alleged that after forming the Debtor, the Haques used assets belonging to Jukebox, including equipment, inventory, accounts receivables and general intangibles, with the proceeds going to the Debtor, Seeburg. In essence, the Petitioners alleged that Shuja and his family were using the Debtor to unlawfully appropriate Jukebox's business.

Before the state court litigation was stayed by the filing of the bankruptcy petition, several hearings were held on motions for temporary restraining orders, rules to show cause and various discovery disputes, and several interim orders were entered. On February 28, 1997, for example, the state court entered an order granting Petitioners access to the premises where the Debtor was operating and access to the books and records of Jukebox. When Petitioners' representative attempted to gain access to the premises, that access was denied. On March 7, 1997, Shuja was ordered to deliver certain documents by March 14, 1997; he failed to do so. This was a pattern that typified the state court proceedings.

On May 19, 1997, the state court entered a temporary restraining order prohibiting Shuja from competing with Jukebox, including by being involved with any business selling Jukebox technology. Until entry of that order, Shuja had been employed by the Debtor as a consultant at a weekly salary of $1,634.61; immediately thereafter, the Debtor hired his wife Mary at the same salary. On the other hand, Omar, the president, was paid $8.00 per hour.[6] The May 19th order also prohibited Shuja from using the name Seeburg in any business with which he was associated. It was therefore obvious to everyone long before this bankruptcy case was filed that Shuja's involvement with the Debtor was of central importance.

The hearing on the Petitioners' request for a preliminary injunction to enjoin the Debtor and the Haques from using Jukebox's assets commenced in June 1997. After three sessions, it was continued to the week of August 18. On August 15, within minutes of a court ordered deposition of Omar, Mr. Brill contacted Petitioners and advised them that he would be representing the Debtor and Omar would not be available for the deposition. The bankruptcy petition was filed on August 18, and on August 21, Mr. Brill filed a notice removing the entire state court action to this Court.

### History of the Debtor

Omar, President of the Debtor, caused the company to be formed in early December, 1996. Omar is a 22 year old college student. He had never run a business before, but had worked part-time at Jukebox. The Debtor was established to manufacture the same jukeboxes that had been made by Jukebox, using his father's patent.[7] According to Omar's testimony before this Court, on January 3, 1997, Shuja granted the Debtor a non-exclusive license to manufacture the patented jukebox for a fee of $10,000 a month. A copy of the license agreement bearing that date and Omar's signature on behalf of the Debtor was produced at the hearing for the appointment of a trustee. However, when ordered by the state court to produce any license agreements, Omar signed an affidavit on July

---

4. The name Seeburg is a registered trademark, owned by Jukebox. Jukebox used the name "Seeburg" on its product, letterhead and other advertising materials.

5. Because many of the parties have the same last name, this Court will refer to them individually by their first name. Members of the Haque family will be collectively referred to as the "Haques."

6. The other family employee, Farouk, Omar's uncle, was listed as a manager and paid $481 per week. The Haques had all been employees of Jukebox.

7. The patented jukebox is the only CD Rom jukebox made.

24, 1997, stating that the Debtor has "no written agreement, license or permission to use the patents and other intellectual property of Shuja Haque." Although the affidavit did not say so, Shuja purportedly assigned all his rights in the patent, any licenses and any past due or future royalties to other of his children, Khalila and Khyaam Haque, on June 6, 1997. Those children are minors.

Omar testified that he started the company with no capital. He planned to fund operations with cash advances from buyers. He knew strangers would not be willing to advance money to a start up company, so he relied on personal friends for his earliest sales. Omar testified that he did obtain some cash advances on such sales in December. He could not, however, remember the names of any of those first customers (who, he said, numbered among his personal friends), nor were there any records such as purchase orders or receipts for the cash.[8]

The Debtor began operating out of the same premises "previously" used by Jukebox.[9] Omar testified that he talked to the building owner in December, 1996 and agreed to lease the property for use by the Debtor. Because he had no money, the December and January rent was paid by his father. The rent checks, however, were written on the accounts of Jukebox.

### DISCUSSION

■ Employment of professionals is governed by § 327 of the bankruptcy code. It permits a trustee, "with the court's approval," to employ one or more professional persons that do not hold or represent adverse interests, are disinterested and that can assist the trustee in carrying out his or her duties.[10] Although there is scant case law on the qualifications required of an attorney seeking employment under this section, it is clear that the bankruptcy court has broad discretion over the appointment of professionals. *In re Harold & Williams Development Co.*, 977 F.2d 906, 910 (4th Cir. 1992)(the judge must exercise that discretion "in a way that it believes best serves the objectives of the bankruptcy system. Among the ultimate considerations for the bankruptcy courts in making these decisions must be the protection of the interest of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding.") *See also In re Watson*, 94 B.R. 111, 114 (Bankr.S.D.Ohio 1988)("Trustees do not [ ] have unfettered discretion in their choice of counsel—the Code expressly subjects the selection to court approval.") *In re Ferguson*, 64 B.R. 553 (Bankr.W.D.Mo.1986).

In the short period of time that this case was pending before presentation of the motion to employ counsel, this Court had several opportunities to observe Mr. Brill's representation of the former debtor in possession. Within the first month, the parties appeared before this Court on a number of matters, including a motion for a preliminary injunction, discovery disputes and a hearing on the motion to appoint a trustee. Based upon his conduct in this case, this Court has concluded that he is not qualified to represent the Debtor.

*Failure to Comply with Scheduling Orders and Discovery Abuses*

The Petitioners' essential claim is that Shuja was using the Debtor to steal their business. Whatever the state law implications, that allegation took on a special significance when the Debtor filed the chapter 11 case. Within a week after the Debtor removed the state proceeding to this Court, the

---

**8.** Notwithstanding this testimony, in an interrogatory propounded by the Petitioners requesting sales made in December, Omar responded that there were none. He later explained that he had not shipped any product in December and he thought that "sale" meant a completed shipment.

**9.** Omar testified that Jukebox was no longer in business at that time. Petitioners contend otherwise.

**10.** This section is applicable to debtors-in-possession by operation of § 1107. At the time the application was presented, the Debtor was no longer a debtor-in-possession because the Court had ordered the appointment of a trustee. Nevertheless, the application was not moot because the Debtor was seeking to employ Mr. Brill as of a date before the petition was filed. If the Court had granted the motion as of the petition date, Mr. Brill would have been entitled to apply for compensation under § 330 for work done while the Debtor was a debtor-in-possession.

Petitioners presented motions for a "temporary restraining order" (actually, a motion for a preliminary injunction under Bankr.R. 7065) and for appointment of a trustee. This Court ordered an expedited schedule because of the gravity of the allegations.[11]

The Court ordered the Debtor to file its response to the motion for injunctive relief by September 5, 1997. Instead, Mr. Brill filed his answer on September 8, without leave to file a late response, a trivial transgression that would be unworthy of mention were it not part of a larger pattern. The Court later set a briefing schedule on the second motion for appointment of a trustee. The Debtor was allowed until September 11, 1997, to respond. Again Mr. Brill did not file a response when required and did not request leave to file a late response. He presented his response in open court at the commencement on the hearing on the motions on September 22. Of course, that response could not then have been of any help to the Court or to opposing counsel in their preparation for the hearing. This Court also set an expedited discovery schedule. Mr. Brill did not fully respond to written discovery as required, but waited until after Omar's deposition had been taken to complete his responses. So those responses were not available to the deposing attorney, although they should have been.

At that deposition, Mr. Brill objected on privilege grounds to questions about the date and place of, and participants in, meetings with him. Of particular interest in light of the Debtor's position that Shuja was not a principal, after Omar testified that Shuja went with him to Mr. Brill's office, Mr. Brill objected to questions that would have established whether Shuja participated in that meeting. Mr. Brill instructed Omar not to

answer those questions. It was the Debtor's position that Shuja has not a principal or controlling person of the Debtor; in fact, under the state court's restraining order, he could not lawfully have been in such a position. The objections and instructions were therefore unfounded and hampered discovery. Shuja's discussion with Mr. Brill would have been very relevant to the Petitioners' contention that Shuja was using the Debtor and his son as means to carry out an unlawful scheme.[12]

As a sanction for the violations of the scheduling orders and the improper objections to deposition questions, this Court barred the Debtor from offering any evidence in its defense to the request for the appointment of a trustee. Mr. Brill's conduct, therefore, not only obstructed the judicial process, but also resulted in a sanction detrimental to his client.

*Debtor's Questionable Conduct and Filings While Represented by Mr. Brill*

A debtor in possession is a fiduciary, with the duties of a trustee. § 1107. During the course of the hearing of the motion for the appointment of a trustee, a number of violations of the bankruptcy code were revealed. Schedule D listed Mario Ganon of Guadalajara, Mexico, as a secured creditor with a claim in the amount of $100,000. A security agreement dated January 2, 1997, granting Ganon a security interest in all of the Debtor's assets was produced at the hearing. There was also a UCC–1 filed with the Secretary of State in June, 1997.[13] Omar also testified that after the petition was filed, the Debtor continued to collect accounts receivable and used this money to fund postpetition operations. If the secured debt is

11. Because the motion for appointment of a trustee was not properly noticed, this Court denied the motion without prejudice and it was refiled on August 29, 1997.

12. Had those questions been answered, the Petitioners might have learned before the September 22nd hearing on the motion for appointment of a trustee that Shuja had guaranteed Mr. Brill's fees. The motion to employ Mr. Brill, with the fee agreement and Shuja's guarantee attached, was filed and served on September 19th, before that hearing. The attorney for the Petitioners,

however, is not on the service list for that motion, despite the fact that he is listed in the Debtor's schedules. In their opposition to the motion to employ Mr. Brill, the Petitioners allege that the fee guarantee was never previously disclosed, and that, not only is their attorney missing from the service list for the motion, but they are listed with incorrect addresses.

13. There is apparently no promissory note. Omar testified that there was no note, but a verbal agreement to repay the loan.

valid, the proceeds from the accounts receivable were cash collateral. Section 363(b)(2) requires either court approval or consent of the creditor prior to use of cash collateral. Omar admitted that the Debtor had never sought court approval to use the cash collateral and nothing in the record reflects consent. In fact, Omar appeared to have never heard of the concept of cash collateral.

Omar also testified that the Debtor funded post-petition operations with an additional $85,000 loan from Mr. Ganon. Section 364 requires court approval of any such post-petition financing. This provision was clearly violated. Assuming Mr. Brill did not know of those matters, it does not appear that the Debtor was well-advised about the requirements of chapter 11.

Mr. Brill certainly knew about the schedules and other documents filed with this Court. In the original notice to remove the lawsuit to this Court, Mr. Brill identified Shuja as the "principal" of the Debtor. That was precisely what the Petitioners were trying to establish; they contend that Omar was merely a straw man. After the Petitioners pointed out the significance of that admission, Mr. Brill, calling it a "scrivener's error," "corrected" it by identifying Omar as the principal. Of course there is considerable reason to believe that, in fact, Shuja was the person in control of the Debtor, in which event Mr. Brill's "correction" would be worse that the original "error."

In the statement of affairs Mr. Brill listed Omar as the person who kept the books and audited them or prepared a financial statement. Omar does not even know what an account receivable aging report is. He had no knowledge of what ledgers, journals or other financial records the Debtor maintained. He could not identify the Debtor's customers. Presumably, Mr. Brill got his information from Omar, the Debtor's "principal." [14] Also presumably, Mr. Brill counseled

Omar about the financial reporting requirements of chapter 11. In the course of those presumed conversations, surely Mr. Brill would have come to realize that Omar did not keep the books and lacked the competence to be responsible for the Debtor's financial record-keeping and reporting. Yet he listed Omar as the person who had kept the books and audited or reported the financial information, and put Omar forward as the "principal" who would perform the Debtor's substantial record keeping and reporting duties in the course of this case.

Finally, the schedules listed Shuja's assignees (his children, "c/o" his wife) as priority creditors. Omar testified that this priority status was because of the Debtor's license to use the patent. Because of Shuja's guarantee of Mr. Brill's fees, this immediately suggests the possibility of a conflict of interest. But apart from that, it is simply incorrect. The license agreement may be an executory contract under § 365. As such, if it is assumed, any claim thereunder may be an expense of administration. But until that happens, if it ever happens, Shuja's assignees' claim is not entitled to priority distribution over the claims of other creditors. In no event was it proper to list it as a priority claim on the schedules. [15] Doing so was either negligent or an attempt to confer an unwarranted advantage on Shuja's children.

## CONCLUSION

▇ This is a Debtor that was in serious trouble before it filed its chapter 11 petition. Perhaps no attorney could have saved it. But assuming the Debtor was lawfully engaged in a legitimate enterprise, and in need of bankruptcy relief, it had to overcome the terrible burden of its pre-bankruptcy record. Its only hope was to be so open and forthcoming in this Court that the Court might be persuaded that the Debtor's troubles were not the result of its own wrongdoing. In-

---

14. If he got it from Shuja, that would raise a question about the veracity of his allegation that Omar is the Debtor's principal. Of course inquiry along these lines at Omar's deposition was blocked by Mr. Brill's unfounded objections.

15. Scheduling Petitioners' claims as "Undisputed" is another example of an error the attorney

should have caught when reviewing the schedules. Mr. Brill explained in his response to the motion for appointment of a trustee that his client thought that "undisputed" referred to the existence of a claim and not its validity. Mr. Brill should have known better.

stead, the Debtor, represented by Mr. Brill, conducted itself in a way that deepened the suspicions surrounding it. In the end, this Court concluded that the appointment of a trustee was of such urgency that it could not be delayed even until the conclusion of the hearing.[16]

For these reasons, the Court denied the motion to employ Mr. Brill as attorney for the Debtor.[17]

---

16. Section 1104(a) provides that "the court **shall** order the appointment of a trustee—(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case...." After listening to six hours of Omar's testimony and reviewing the paper record, the Court became persuaded that a trustee had to be appointed and further delay would seriously jeopardize the interests of creditors and the estate. The Debtor had already been barred from presenting evidence, and completion of the Petitioners' case would have necessitated a lengthy continuance because of prior commitments. The Court therefore took the action it deemed necessary.

17. There is enough reason in the record of this case to deny the motion to employ Mr. Brill.

But it must be said that Mr. Brill has his own problems. In another chapter 11 case in which Mr. Brill represented the debtor, Julian Service Industries, Inc., 95 B 26232, this Court revoked confirmation of a plan on the grounds that Mr. Brill had procured that confirmation by fraudulent representations. Specifically, Mr. Brill reported that the plan had been accepted by the requisite majority of creditors when, in fact, it had not, and he failed to disclose facts that would have led to the conclusion that the plan had not been accepted. Those matters are likely to be the subject of further inquiry and proceedings in that case. They are mentioned here because they were known to the Court at the time it denied the motion to employ Mr. Brill in this case and undoubtedly colored this Court's view of Mr. Brill.