### In re DIAMOND MORTGAGE CORPORATION OF ILLINOIS and A.J. Obie & Associates, Inc., Debtors.

**Bankruptcy Nos. 86 B 13066, 86 B 13067.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Nov. 27, 1990.

See also 105 B.R. 876.

## MEMORANDUM, OPINION & ORDER

ROBERT E. GINSBERG, Bankruptcy Judge.

This matter comes before the Court on the application of attorney David F. Platek ("Platek") for allowance of final compensation and reimbursement of expenses. The following constitutes the Court's findings of fact and conclusions of law.

### FACTS

Diamond Mortgage Company of Illinois and A.J. Obie and Associates, Inc were related entities intertwined in a single business of lending money to high risk consumer borrowers secured by first mortgages on the borrowers' homes. While Diamond and Obie did business in many states in the Midwest, the principal operations were in Michigan and Illinois. The scheme was the same in both states. In general, an investor would give money to Obie which would advance it to Diamond which in turn lent it to a consumer borrower. Diamond lent money exclusively to consumer homeowners, and all Diamond loans were to be secured by a first mortgage on the borrower's home. Diamond assigned the mortgages it received to Obie which in turn was supposed to assign them to Obie investors to provide security for their investments. Diamond would continue to service the mortgage for a percentage fee. The investor was to get an investment paying a high rate of return because of the high risk nature of the borrower. However, the investment was also supposedly relatively safe because of the assignment of a mortgage on the borrowers' homes to the investor.

Unfortunately for the Diamond/Obie investors the theory and the reality were vastly different. The principals of Diamond/Obie diverted huge amounts of the investors' money from the Obie investors to the principals for their own use. As a result, the Diamond/Obie business became a Ponzi scheme with not enough mortgages to go around to secure all investors' investments in Obie. As a result, later investments were often used to either pay interest to earlier investors or to repay earlier investors. Many investors were never "matched" to a mortgage or mortgages to secure their investments. Such investors were paid interest at rates of about 15%, but were, in reality nothing more than unsecured lenders to Obie.

The inevitable denouement came in August 1986 when Diamond and Obie regulators in Michigan and Illinois caught on to the massive shortfall in the Diamond/Obie mortgage portfolio. As the fraud was uncovered, the Diamond/Obie house of cards collapsed and both the Michigan and Illinois companies wound up in bankruptcy. The Michigan entities filed Chapter 7 petitions in the Eastern District of Michigan. *In re Diamond Mortgage Corp. and A.J. Obie & Associates, Inc.*, Nos. 86–04270–B, 86–04271–B (Bankr.E.D.Mich.). On August 26, 1986, the Illinois entities, Diamond Mortgage Corporation of Illinois and A.J. Obie and Associates, Inc. each filed Chapter 11 petitions in this court. The Illinois and Michigan bankruptcy cases have been administered entirely separately.[1] The Illi-

---

1. It has been reported to the court that in the Michigan cases, no dividend will be paid to

nois cases, were originally assigned to former Judge Charles B. McCormick of this court. When Judge McCormick retired, the cases were assigned to his successor, Judge Susan P. DeWitt. However, Judge DeWitt recused herself and the cases were reassigned to the undersigned. By the time of the Chapter 11 filing, the management of the debtors who had driven the debtors to bankruptcy (several of whom eventually wound up in prison) had been replaced with new management. Therefore, despite the debtors' rather checkered history, the debtors were allowed to remain in possession. However, Judge McCormick did order the U.S. Trustee to appoint an examiner to investigate the debtors' affairs and history. John Costello was chosen to be the examiner and his selection was approved by Judge McCormick.

Shortly after the cases were filed, the debtors sought to retain three sets of lawyers to assist the debtors in the Chapter 11 case. The firm of Schwartz, Cooper, Kolb and Gaynor was to be retained primarily as bankruptcy counsel to handle the Chapter 11 case. Cherry and Flynn was to be hired to pursue litigation against those responsible for the Diamond/Obie debacle. David Platek was to be hired to enforce the mortgages that Diamond had managed to secure from its consumer borrowers and to collect on the loans made to those borrowers.

Given that Diamond and Obie had taken in between $40 million and $50 million from hundreds of investors and the fact that despite the skimming off of investors' funds and the Ponzi scheme Diamond did have a sizeable mortgage portfolio, Judge McCormick approved the retention of Schwartz, Cooper, Cherry and Flynn, and the retention of Platek. However, in approving Platek's retention, Judge McCormick was not told of a number of significant facts that might have affected his decision. The application submitted under then Bankruptcy Rule 2014 for Platek's retention was woefully deficient in terms

of disclosure. Platek offered no affidavit or other pleading to supplement the disclosure in the application to retain him. Among other things, Judge McCormick was not told that Platek, who had been Diamond's foreclosure attorney before the Chapter 11 case, had a significant prepetition claim against Diamond for services rendered, that he had no intention of waiving the claim, and that he would seek to realize on the claim postpetition. Judge McCormick was not told that Platek shared offices with Vince Locascio, who, apparently at Platek's suggestion, had invested heavily in Obie individually and as trustee for his children. Judge McCormick was not told that Locascio had substituted for Platek on Diamond matters in the past and would continue to do so in the future. Finally, Judge McCormick was not told that Platek had originally been hired by some of the very people who were directly responsible for the Diamond/Obie fraud and that he had done some general corporate work in addition to foreclosure work for the former management. Of course, any of these matters might well have caused Judge McCormick to think twice before approving Platek's retention.

Platek's work for the Chapter 11 debtors was confined almost entirely to matters relating to enforcing the mortgages. He pursued numerous foreclosures for Diamond over the period between the filing of the case in August of 1986 and his firing by the reorganized debtors in September of 1989. He also represented Diamond in bankruptcy cases filed by its borrowers and did other work related to the enforcement of mortgages such as dealing with building violation problems on properties Diamond acquired through foreclosure.

In July of 1989 a Chapter 11 plan for Diamond/Obie was proposed by the committee representing its unsecured creditors (the vast bulk of whom were investors who were not permanently matched to one or more mortgages) ("Creditors' Committee").

nonpriority unsecured creditors. In the Illinois cases, a joint Chapter 11 plan providing for an orderly liquidation of the debtor's mortgage portfolio has been confirmed and general unse-

cured creditors—most of whom are unmatched investors—may receive as much as 40% of their claims.

That plan called for the orderly liquidation of Diamond's mortgage portfolio and the pursuit of various causes of action. It was hoped that the plan might produce as much as a 40% dividend for the unsecured creditors. William Brandt was chosen as chief executive officer of the reorganized debtor at the behest of the Creditors' Committee. One of Brandt's first acts was to terminate Platek's services and to replace him with Letvin and Stein.

Thereafter, Platek filed the instant application seeking final compensation in the amount of $181,872.84 and reimbursement of expenses in the amount of $117,267.05 for all of the services he performed for Diamond during the course of the Chapter 11 case. The application was opposed by the Creditors' Committee and the United States Trustee. The court held extensive evidentiary hearings on the application during the course of which a great deal of additional information was revealed about Platek's representation of this estate. That information raises serious questions about both the propriety of Platek's conduct as an attorney during these cases and the quality of the services he rendered.

During much of the course of the Diamond/Obie Chapter 11 cases, Platek embarked on a scheme designed to get his prepetition debt repaid. At certain times in the cases, Platek was being compensated by this court for his foreclosure work at a rate of $450 per foreclosure. At other times, he was being paid at a flat rate of $45 an hour. At no time was he ever being paid a rate of $75 per hour. Nevertheless, in numerous foreclosure cases, Platek falsely swore to various state court judges that he was being paid a rate of $75 an hour for Diamond foreclosures. The state court judges would routinely award him fees in that amount. Those fees would then be added to the foreclosure judgment pursuant to the mortgage instruments. When the property foreclosed or was sold and the judgment was paid off, Platek would take the difference between the $75 an hour state court award and the $45 an hour rate or the $450 flat rate he was allowed by this court and apply it to reduce his prepetition debt. Platek never informed the state court of this practice. Once he did seek to have the practice ratified by this court, but that motion was denied. He nevertheless continued his prior practice even after that motion was denied.

As previously indicated, Platek shared office space with Lawrence Locascio. Platek also shared space with Alex DeVience. At various times, Locascio, DeVience and Platek all appeared on the same letterhead. However, they were not partners, and, at the request of their malpractice carrier, the joint letterhead was dropped. Thereafter, Platek appeared as "of counsel" on DeVience's letterhead.

Although Locascio was an investor of Diamond and clearly not "disinterested",[2] Platek asked Locascio to cover for him on Diamond matters from time to time after the filing of the petition. Platek never sought nor obtained authority for Locascio to represent the estate. The Creditors' Committee claims that Platek also reimbursed Locascio for his efforts on behalf of the estate and then proceeded to bill the estate for Locascio's time as Platek's own time. While there is some circumstantial evidence to back up that claim such as the checks that Platek issued to Locascio and Platek's admission of the practice at his deposition, Platek denied the practice ever took place at the hearing on this application. The Creditors' Committee was unable to point to any entry on Platek's fee application that in reality was Locascio's time. The court is not convinced that Platek actually represented Locascio's time as his own, and nothing in this decision is based on the alleged practice actually having taken place.

It is customary in foreclosures for the lender to purchase "minutes of foreclosure" from a title company to insure against having missed naming and serving all necessary parties. Although a representative of Chicago Title and Trust ("CT & T") testified that Platek could have pur-

2. See 11 U.S.C. § 101(13).

chased such minutes in bulk from CT & T at a reasonable negotiated price during his representation of this estate, Platek chose not to purchase such minutes. He did not even make a reasonable inquiry into whether such minutes were available to Diamond or try to negotiate price with CT & T. Instead, Platek chose to deal with his office mates Locascio and DeVience who were involved with a competing title company. What Platek purchased from Locascio and DeVience was useless in terms of protecting the estate against his own mistakes in the foreclosure process. Platek purchased nothing more than title insurance commitments which expired in six months unless the option was exercised and title insurance purchased. In virtually every case, the option expired and the estate was left unprotected.

For these options, Platek paid between $280 and $300 to Locascio and DeVience. He could have purchased minutes of foreclosure for as little as $225, which would have been actual insurance for the estate lasting two years rather than merely an option for insurance. Although he knew he was not buying minutes of foreclosure, Platek nevertheless sought reimbursement for purchases of minutes of foreclosure in his fee applications filed with this court. Platek never disclosed to this court what he was buying and the fact that he was buying it from people with whom he shared office space.

The nature of Platek's work was such that the estate needed insurance against his neglect. In several foreclosure cases he failed to name such obvious parties as condominium associations, the probate estate or utilities. It has already cost the estate thousands of dollars to straighten out these omissions. Of course, it is possible other errors have yet to surface. Since the estate is without the benefit of minutes of foreclosure to protect it against Platek's errors and omissions, it is impossible to ascertain the estate's potential exposure at this point without an expensive reexamination of every foreclosure Platek handled. It is clear that there may well be more problems to be discovered. Platek's successor as foreclosure counsel for Diamond has already found unrecorded sheriff's deeds in several files, situations where Platek failed to get mortgagee in possession orders for vacant or rental properties, and instances where Platek failed to dismiss foreclosure cases after the debtor had cured the default or paid off the mortgage.

Perhaps the most significant example of Platek's shortcomings in representing this estate is his incomprehensible overbid theory. Platek seemed to think that somehow or other Diamond could bid more than the amount of its mortgage at a foreclosure sale without exposure. As he saw it, if a third party outbid Diamond, Diamond was entitled to the amount of its bid rather than the amount of its judgment. The theory is ludicrous. It enjoys no support whatsoever in statute or case law.

All Platek did in the overbid situation was expose the estate to significant potential liability. If no third party were to come in and outbid Diamond, Diamond would have to pay the difference between the amount of its judgment and its bid to either junior lienors, or, if there were no junior lienors, to its debtor. Alternatively, a court might view the overbid as a misrepresentation of the amount of the judgment and question the validity of the sale. Platek's overbid adventures have already produced several significant problems for Diamond. It is clear that Platek's overbid theory has exposed the debtor to serious liability problems and has cost and will continue to cost the debtor thousands of dollars in legal fees.

One of the overbid cases, the Sanders case, presents additional problems. Prior to receiving the approval of the investor matched to the Sanders mortgage, Platek sold the Sanders judgment to the Reverend Darryl Hickman for $500 more than the amount of Diamond's foreclosure judgment. Once the assignment was approved by the Diamond/Obie investor who had been matched to the Sanders mortgage, Platek and Diamond should have dropped out of the foreclosure process. Nevertheless, Platek continued with the foreclosure sale. He appeared at the sale and bid $20,000 which was roughly $5,000 in excess

of the foreclosure judgment on behalf of Diamond, which no longer had any interest in the judgment. A third party outbid him and obtained the property. Platek prepared an order approving the sheriff's sale indicating that Diamond was entitled to $20,000, even though its judgment was only for $14,347.81 and the judgment had been sold to the Reverend Hickman.

Platek then gave Diamond the $14,849 Hickman originally paid for the judgment, took a $500 fee for himself from the sales proceeds, and paid the balance of the sales proceeds, $19,171.42, to Reverend Hickman. The result was that Reverend Hickman made a nice profit on the deal (the difference between what he paid for the judgment and the amount he received from Platek). Platek made a $500 fee. That fee was paid from proceeds that would otherwise have gone to Reverend Hickman. Therefore, although he denies it, it is impossible to reach any other conclusion than that Platek was representing both Diamond and Reverend Hickman in the Sanders foreclosure, particularly in light of the fact that Diamond's interest in the transaction ended well before the foreclosure sale took place. Diamond took all of the risk. Reverend Hickman made a nice profit as a result of Platek's novel overbid theory, and Reverend. Hickman paid Platek for his services. Diamond has already had to deal with one attempt by the Sanders probate estate to look into the sale in probate court and may well have to deal with other claims by that estate in the future.

When Brandt took over the reorganized debtor on behalf of the Creditors' Committee, he investigated Platek's activities and terminated his services. Letvin and Stein were retained by the reorganized debtors to take over the foreclosure work. Platek failed to comply with Letvin and Stein's requests to turn over files and supply information. Eventually this court had to order him to turn over the files. Even then, without seeking to amend or alter the turnover order, Platek stripped the files of hundreds of documents. He seeks compensation for time spent stripping the files and claims that the documents he stripped were copies of letters and similar documents that he had sent the debtors and which should have been available in the debtor's files. That explanation does not address his failure to obey a clear cut order of court to turn over the files, not the files after he had stripped them.

## HOLDING

The Creditors' Committee strongly opposes Platek's fee application and urges that he be denied all compensation and reimbursement of expenses. The U.S. Trustee also opposes the application but recommends that Platek be allowed up to 40% of the compensation he seeks and be allowed reimbursement of certain of his expenses. Although the record described above clearly could justify total denial of compensation and expense reimbursement to Platek, for reasons described below, this court has decided to exercise its discretion and allow Platek some compensation and reimbursement. The fact is that despite the many shortcomings in his representation of these estates, Platek did manage to successfully foreclose on hundreds of properties on behalf of Diamond and did render other services in connection with the enforcement of Diamond's mortgages which were of benefit to the estates.

Therefore, the court will allow Platek 40% of the amount he seeks as final compensation. This means that he will be allowed 40% of the amount he seeks in this application; and all amounts of compensation previously awarded to Platek in these cases as interim compensation are reduced by 60%. In addition, Platek's fee award is further reduced (1) by giving the estates a credit for all moneys paid to Platek in satisfaction of his prepetition claims for fees; (2) by disallowing any compensation for the Sanders case; (3) by an additional amount of $500 representing the fee paid to Platek by Reverend Hickman.

Platek's expenses are allowed in full, except he is denied all expenses incurred in the Sanders case. Furthermore, all claims for reimbursement for expenses for the title insurance options purchased from Locascio and/or DeVience at any time during

the course of these cases are disallowed in their entirety.

## JURISDICTION AND PROCEDURE

This matter arises under 11 U.S.C. § 330. Accordingly, this Court has jurisdiction over the proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and is before the court pursuant to the General Order of the United States District Court of July 10, 1984, and Local Rule 2.33 of that court automatically referring bankruptcy cases and proceedings to this court for hearing and determination.

## DISCUSSION

In order to effectively police participation by professionals in bankruptcy cases, particularly those who seek compensation out of the assets of the estate, the Bankruptcy Code provides the court with a variety of powerful weapons including most importantly total or partial disqualification and reduction or denial of fees.

▪ The analysis of the scope of the court's power to disqualify professionals or limit or deny applications by professionals for compensation focuses on two complimentary provisions of the Bankruptcy Code, §§ 327 and 328. The analysis begins with § 327(a) which provides:

> [T]he trustee, with the court's approval, may employ one or more attorneys, ... or other professional persons, that do not hold or represent an interest adverse to

the estate, and that are disinterested persons. . . .

11 U.S.C. § 327(a). Of course, § 327(a) is not limited in impact to professionals employed by a trustee. It applies to professionals retained by a Chapter 11 debtor in possession by virtue of § 1107(a)[3] which gives a debtor in possession in Chapter 11 many of the rights and duties of a trustee. Since a Chapter 11 trustee would have to comply with § 327 in the selection and retention of professionals, so too the debtor in possession must comply with § 327 in choosing and hiring professionals. Any doubt in that regard is eliminated by § 1107(b).[4] *See In re Al Gelato Continental Desserts, Inc.* 99 B.R. 404, 406 (Bankr. N.D.Ill.1989); *In re Watson,* 94 B.R. 111, 114 (Bankr.S.D.Ohio 1988); *In re Watervliet Paper Co.,* 96 B.R. 768, 769–70 (Bankr.W.D.Mich.1989), *aff'd,* 111 B.R. 131; *In re Triangle Chemicals, Inc.,* 697 F.2d 1280, 1284 (5th Cir.1983); *In re Kelton Motors, Inc.,* 109 B.R. 641, 645 (Bankr. D.Vt.1989).

▪ Platek was hired by Diamond as one of its attorneys, primarily to do foreclosures. Thus, his retention required court approval under § 327(a). *Watson,* 94 B.R. at 114; *In re Seatrain Lines, Inc.,* 13 B.R. 980, 982 (Bankr.S.D.N.Y.1981).[5]

▪ The second provision to be considered in the initial analysis is § 328(c). Section 328(c) sets out some of the possible consequences of failure to meet the substantive requirements for retention as a professional for an estate under § 327(a).[6] Section 328(c) provides:

> by or representation of the debtor before the commencement of the case.

---

**3.** Section 1107(a) provides:

Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under the chapter.

**4.** § 1107(b) provides:

Notwithstanding § 327(a) of this title, a person is not disqualified for employment under § 327 of this title by a debtor in possession solely because of such person's employment

**5.** Of course, Platek represented the debtor before the Chapter 11 case. However, by virtue of § 1107(b) that fact did not prevent his retention under § 327(a). Platek was not retained as special counsel under § 327(e) although the result would not differ had Platek been retained under § 327(e).

**6.** Failure to comply with the procedural requirements of § 327(a), i.e., total failure by a professional to obtain court approval prior to representing the estate can lead to total or partial denial of compensation without regard to whether the professional qualifies substantively for employment under § 327(a). *See, In re Gra-*

Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person ... if, at any time during such professional person's employment ... such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c).

 Section 327(a) acts prospectively by telling those professionals who fail to meet the substantive requirements for retention by the estate that they are disqualified from obtaining court approval, which is the prerequisite to such employment. Section 328(c) acts retrospectively by telling those professionals whose retention under § 327(a) was improper or who, during the case, failed to live up to the substantive requirements of § 327(a) on an ongoing basis while working for the estate that they might lose some or all the compensation to which they might otherwise be entitled.[7]

 In light of the fact that a professional, like Platek, who is retained by an estate must live up to the requirements of § 327(a) on an ongoing basis, what are those requirements? Section 327(a) has two essential requirements. First that the professional be disinterested. Second that the professional not hold or represent an interest adverse to the estate while employed by the estate. In addition to the specific requirements of § 327(a), two additional requirements are implied under § 327(a): (1) the professional must disclose to the court and the parties in interest all facts which might bear on the professional's qualification for retention under § 327(a) both at the time of the original application and on an ongoing basis;[8] (2) the professional must live up to all requirements of appropriate professional codes of conduct on a continuous basis. For Platek, that required him to live up to the Illinois Code of Professional Responsibility, Ill. Rev.Stat. ch. 110A, Article VIII (Supp. 1990), which calls for avoidance of conflicts of interest and requires candor in dealings with tribunals.

The ultimate issue is how Platek stacks up in terms of his disclosure to this court, his qualifications for being disinterested, his holding or representing adverse interests, and his compliance with the governing professional code; and the answer is that he failed miserably on all counts. He failed to disclose to Judge McCormick or the undersigned facts which make it clear that he was not eligible for appointment as a professional representing the estate under § 327(a); he was not disinterested; he both held and represented interests adverse to those of the estate during the course of

bill Corp., 113 B.R. 966, 971–72 (Bankr.N.D.Ill. 1990); *In re Land,* 116 B.R. 798 (D.Colo.1990).

7. There is another retrospective remedy the court has available to it for failure to live up to the requirements of § 327(a) for employment by the estate on an ongoing basis, and that is disqualification after retention but before completion of the task or tasks for which the professional was retained by the estate. Nothing in the Bankruptcy Code specifically gives the court power to remove a professional previously retained by the estate who no longer satisfies the requirements of § 327(a). Nevertheless, there is little doubt that the court has inherent power to remove a professional who would be disqualified from employment by the estate on a prospective basis. *In re PHM Credit Corp.,* 99 B.R. 762 (E.D.Mich.1989); *In re Roger J. Au & Son, Inc.,* 65 B.R. 322, 326 (Bankr.N.D.Ohio 1984) ("while disqualification is not a legislatively imposed sanction, this court, as one of equity,

certainly has the power to so act") (citations omitted). In effect the approval of the court contemplated by § 327(a) implies continuous approval. The court that gives the approval also has the inherent power to revoke it should circumstances change or new information become available. *See In re Watson,* 94 B.R. 111 (Bankr.S.D.Ohio 1988); *In re Albright,* 95 B.R. 560 (N.D.Ill.1989); *In re Watervliet Paper Co., Inc.,* 96 B.R. 768, 770 (Bankr.W.D.Mich.1989) ("Attorneys who do not meet [the requirements of § 327(a)] are statutorily disqualified."). Of course, the two retrospective remedies can be combined, i.e., the court can both remove a professional employed by an estate and deny or limit that professional's compensation for failure to live up to the requirements of § 327(a) on an ongoing basis. *See, Roger J. Au & Son,* 65 B.R. 322.

8. Bankruptcy Rule 2014 and former Bankruptcy Rule 2014.

his representation of the estate; and he regularly failed to live up to professional standards governing conflicts of interest. Because the court is evaluating Platek's behavior in hindsight, reduction or denial of fees and expenses is the appropriate sanction.[9]

## I. PLATAK'S SHORTCOMINGS

### A. CONFLICT OF INTEREST

It is fundamental that attorneys may not represent conflicting interests without full disclosure and consent by all parties. ABA Model Code of Professional Responsibility DR 5–105; ABA Model Rules of Professional Conduct Rule 1.7; *Matthew* 6:24. The basic principles underlying the conflict of interest prohibition take on an added dimension when applied to those representing a bankruptcy estate. Concepts of client consent and waiver become difficult to apply when the client, the estate, is a fiduciary for another group, the creditor body; and where the client's decisions with respect to retention of professionals, including attorneys, are subject to judicial review after disclosure, notice, and hearing. In addition, certain conflicts that a client could waive after full disclosure outside of the bankruptcy context, such as simultaneous representation of the client and client's creditor, are prohibited by the Bankruptcy Code itself from being waived. *See In re Kendavis Indus. Int'l, Inc.,* 91 B.R. 742 (Bankr.N.D.Tex.1988); *In re Lee,* 94 B.R. 172 (Bankr.C.D.Cal.1988.). Thus, the conflict of interest rules are more strictly applied in the bankruptcy context than in other areas of the law, at least insofar as professionals retained by the estate are concerned.

There are two major reasons for this approach: first, to maintain the integrity of the bankruptcy process, *In re Michigan General Corp.,* 78 B.R. 479, 484 (Bankr. N.D.Tex.1987); and second, to "assure that counsel devotes undivided loyalty to [the

client]." *Lee,* 94 B.R. at 178. The problem lies in determining what types of conflicts of interest mandate disqualification or impact on awards of compensation for the lawyers who represent estates in bankruptcy cases and proceeds. It is universally recognized that attorneys are prohibited from representing *actual* conflicts of interest in bankruptcy. However, the caselaw is far from unanimous insofar as *potential* conflicts are concerned.

An actual conflict of interest has been defined as "an active competition between two interests, in which one interest can only be served at the expense of the other." *In re B H & P, Inc.,* 103 B.R. 556, 563 (Bankr.D.N.J.1989), *rev'd in part,* 119 B.R. 35 (D.N.J.1990). The Illinois Code of Professional Responsibility prohibits such dual representation, stating:

(a) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment. . . .

(b) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client.

Ill.Code Prof.Resp., Rule 5–105. In contrast, a potential conflict of interest has been defined as "one in which the competition is presently dormant, but may become active if certain contingencies occur." *B H & P,* 103 B.R. at 563. The Code of Professional Responsibility and the Bankruptcy Code are of little help in determining whether purely potential conflicts of interest should lead to automatic disqualification of attorneys representing the estate. The problem has been left to the courts to resolve; and two lines of authority have emerged.

---

**9.** Note that if Platek's conflicts and indiscretions had been brought to the attention of the court at the start of the case, the appropriate sanction would have been disqualification. Had the court become aware of Platek's conduct during the case, the appropriate sanction would have

been removal and possible reduction or denial of compensation and reimbursement. However, since Platek has been fired by the reorganized debtor, all that remains is the question of his fees and expenses.

According to the so-called "rigid strict constructionist rule,"[10] the *potential* for conflict or the mere *appearance* of impropriety constitutes a disqualifying conflict of interest. *See, e.g., In re Watson,* 94 B.R. at 116 ("[a] disinterested person should be divested of *any* scintilla of personal interest ...") (emphasis added); *Lee,* 94 B.R. at 178 ("[t]he unsanctioned representation of conflicting interests is one of the most serious sins that a lawyer can commit"); *Kendavis,* 91 B.R. at 754; *In re Parkway Calabasas, Ltd.,* 89 B.R. 832 (Bankr.C.D.Cal. 1988); *In re Glenn Elec. Sales Corp.,* 89 B.R. 410, 423 (Bankr.D.N.J.), *aff'd,* 99 B.R. 596 (D.N.J.1988) *quoting* 2 *Collier on Bankruptcy,* ¶ 327.03 ("professional persons employed by the trustee should be free of *any* conflicting interest which *might* in the view of the trustee or the bankruptcy court affect the performance of their services or which *might* impair the high degree of impartiality and detached judgment expected of them ...") (emphasis added).

The strict approach relies heavily on two sources. The first is the ABA Model Code of Professional Responsibility particularly Cannon 9 of that Code providing, "A lawyer should avoid even the appearance of impropriety." The second is the caselaw under the Bankruptcy Code of 1898 which held that any conflict, no matter how remote, was reason enough for disqualification. *See In re Michigan General, Corp.,* 78 B.R. at 483 (Bankr.N.D.Tex.1987) *quoting In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1256 (5th Cir.1986) *quoting In re Philadelphia Athletic Club, Inc.,* 20 B.R. 328, 334 (E.D.Pa.1982) ("professionals engaged in the conduct of a bankruptcy case should be free of the *slightest* personal interest which *might* be reflected in their decisions concerning matters of the debtors' estates or which *might* impair the high degree of impartiality and detached judgment expected of them") (emphasis added). Thus, according to the rigid construction-

ist's view, there is no need to find an actual conflict of interest in order to impose sanctions upon an attorney.[11]

Other courts are more flexible in their interpretation and application of the amorphous term conflict of interest, preferring to analyze potential conflicts on a case-by-case basis. *See In re Inslaw, Inc.,* 97 B.R. 685, 703 (Bankr.D.D.C.1989) ("[T]his Court has the authority to deny fees in their entirety, if it determines at any time during the course of representation the existence of a conflict of interest...."); *In re Oliver's Stores, Inc.,* 79 B.R. 588 (Bankr. D.N.J.1987) (potential conflicts are not grounds for per se disqualification); *Waterfall Village,* 103 B.R. at 343–45; *In re Stamford Color Photo, Inc.,* 98 B.R. 135, 138 (Bankr.D.Conn.1989) ("merely hypothesizing that conflicts may arise is not a sufficient basis to warrant ... disqualification"). *In re Marine Power & Equip. Co.,* 67 B.R. 643, 653 (Bankr.W.D.Wash.1986) (attorneys fees may be denied if conflict of interest is present).

This Court finds the latter line of cases taking a more flexible approach to the problem of potential conflicts of interest to be more persuasive for two reasons. First the Bankruptcy Code itself has been amended to include the term *"actual* conflict of interest." 11 U.S.C. §§ 327(c), 1107(a). *See also* 11 U.S.C. § 1107(b) (attorney is not precluded from representing a debtor in possession solely because the attorney represented the debtor prior to filing); 11 U.S.C. § 1103(b) (attorney employed to represent one or more creditors of the same class not automatically precluded from such representation because such representation does "not per se constitute the representation of an adverse interest"). Thus, the Bankruptcy Code itself seems to recognize and accept a distinction between actual and potential conflicts of interest.

---

**10.** *In re Waterfall Village of Atlanta, Ltd.,* 103 B.R. 340, 343 (Bankr.N.D.Ga.1989).

**11.** Note that the *Kendavis* court went even further by stating that the term "potential conflict"

is a misnomer because "once there is a conflict, it is *actual—not potential." Kendavis,* 91 B.R. at 754.

■ Second, this court is mindful of the inherent right of individuals or entities seeking legal services to employ the counsel of their choice subject to the restrictions of §§ 327(a) and 328(c). *See, e.g., In re Watson,* 94 B.R. at 114 ("It is undisputed that trustees [and debtors in possession] should be permitted to select their own attorney without interference from others"); *In re Market Response Group, Inc.,* 20 B.R. 151 (Bankr.E.D.Mich.1982). Under the strict construction approach, however, this right would be seriously undermined because any attorney whose past or current representation of other clients would give rise to even the slightest chance of a conflict of interest vis-a-vis another client is automatically eliminated. Given the complex and intertwined nature of the business infra-structure, the ever increasing number of bankruptcies, and the pressing demand for competent legal services so characteristic of today's society, such a rule is simply not feasible. In the words of one court,

> We believe that by allowing the debtor's counsel to continue in its representation, we are bolstering the public image of the legal system by ensuring a party's right to choose counsel and avoiding the extreme prejudice which would be suffered by the debtor should its counsel be disqualified after two years of loyal and competent representation.

*In re Quakertown Glass Co.,* 73 B.R. 468, 470 (Bankr.E.D.Pa.1987).

This court finds persuasive the reasoning of the First Circuit which noted:

> The naked existence of a potential for conflict of interest does not render the appointment of counsel nugatory, but makes it voidable as the facts may warrant. It is for the court to decide whether the attorney's proposed interest carries with it a sufficient threat of material adversity to warrant prophylactic action (say, disqualification or disgorgement or invalidation of a lien).

*In re Martin,* 817 F.2d 175, 182 (1st Cir. 1987).

■ Accordingly, this court concludes that total or partial disqualification or reduction or denial of fees and expenses is required, without exception, if the conflict of interest is actual; however, the imposition of sanctions for potential conflicts is within the discretion of the court. *See Inslaw,* 97 B.R. at 703; *Oliver's Stores, Inc.,* 79 B.R. at 588; *Waterfall Village,* 103 B.R. at 343–45; *Stamford Color Photo, Inc.,* 98 B.R. at 138; *Marine Power & Equipment,* 67 B.R. at 653.

■ In determining whether to sanction an attorney whose conflict of interest is only potential, the following factors will be considered:

1. Whether "the likelihood of public suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case" *United States v. Hobson,* 672, F.2d 825, 828 (11th Cir.1982), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166;

2. The foreseeability or likelihood that the potential conflict will become an actual conflict;

3. The availability of other competent counsel;

4. The specific circumstances surrounding the case which make the attorney's representation inappropriate.

■ Insofar as the present case is concerned, it is apparent that Platek was engaged in both *actual* and *potential* conflicts of interest. Platek's dual representation of the debtor and Reverend Hickman in the sale of the Sanders property clearly rises to the level of actual conflict of interest. As stated previously, Platek sold the Sanders foreclosure judgment to Hickman, and then proceeded with the foreclosure sale, bidding the property in Diamond's name. Clearly, the interests of Reverend Hickman in selling the Sanders property at the highest price possible could only be served at the expense of Diamond's interest in selling the property at a commercially reasonable price. Because Platek overbid at the sale of the Sanders property in Diamond's name, he allowed one client, the debtor, to bear the risk of overbidding when the overbidding only benefited his other client, Reverend Hickman. Such behavior is not only a blatant example of an

actual conflict of interest but also a complete disregard for the interests of the debtor's estate.

■ Platek's representation of the debtor and his affiliation with attorneys, Locascio and DeVience, also involved Platek in an actual conflict of interest. Platek shared office space, office expenses and a letterhead with Locascio and DeVience. Locascio was a prepetition creditor of the debtor. In addition, as described previously Platek purchased inadequate title commitments from his office mates, Locascio and DeVience, instead of purchasing readily available adequate title insurance from those with whom he was not affiliated. His friendship and relationship with Locascio and De Vience overcame his obligation to his client. At least one court has held that such behavior could warrant the attorney's disqualification from representing the debtor. *In re Wittman Eng'g & Mfg. Co.*, 66 B.R. 488, 491 (Bankr.N.D.Ill.1986).

■ In fact the discussion of actual versus potential conflicts of interest is largely academic in this case. Virtually all of Platek's potential conflicts at the outset ripened into actual conflicts during the course of the Chapter 11 case. Thus, for example, while the existence of his prepetition claim against the debtors may have only been in theoretical conflict with his ability to function as foreclosure counsel to the debtors in possession, the conflict became actual when Platek came up with the scheme to misrepresent to the state court the amount of fees he was allowed by this court for foreclosures in order to inflate the state court fee awards and foreclosure judgments and thereby provide himself with a slush fund to pay down his prepetition claim. In so doing, he endangered the interests of his client by obtaining judgments of foreclosure which are at least arguably tainted by fraud.

The sum is that Platek was guilty of allowing serious conflicts of interest to arise and affect his representation of these debtors to the debtors' detriment. Virtually any of these conflicts alone would justify a substantial reduction in Platek's allowable fees and expenses for these cases.

Collectively, the conflicts justify the 60% reduction in compensation and the other reductions in compensation and reimbursements this court has determined to be appropriate.

## SECTION 328(c)

■ Section 328(c) of the Bankruptcy Code imposes three requirements on professionals like Platek who are retained by bankruptcy estates (or by Official Committees in Chapter 11 cases). First, the professional must be disinterested; second, the professional cannot hold an interest adverse to the estate; and third, the professional cannot represent an interest adverse to the estate. Several courts have melded parts of this three-pronged test, holding that "[t]he disinterested person and adverse interest tests for employment of professional persons ... overlap in ... the § 101(13) definition of 'disinterested person'...." *In re Intech Capital Corp.*, 87 B.R. 232, 233 (Bankr.D.Conn.1988). *See also Waterfall Village*, 103 B.R. at 343; *Stamford Color Photo, Inc.*, 98 B.R. at 137. The distinction is not of great significance. Suffice it to say, that throughout his representation of these bankruptcy estates, Platek could not have satisfied any of the requirements of § 328(c) regardless of how that section is parsed.

### a. *Requirement of Disinterestedness*

■ There is no doubt that § 328(c) requires a professional retained by an estate under § 327 to remain disinterested throughout his or her tenure with the estate. The term disinterested is a word of art in bankruptcy defined by § 101(13) of the Bankruptcy Code to require, inter alia, that a disinterested be someone who:

(A) is not a creditor, an equity security holder, or an insider, ...

11 U.S.C. § 101(13).

The term "creditor" as used in § 101(13)(A) is defined in § 101(9)(A) as "an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor...." 11 U.S.C. § 101(9)(A). Under a literal in-

terpretation of §§ 101(9) and 101(13), § 328(c) would prevent the court from appointing any attorney who asserted a claim for fees on services provided to the debtor prior to the moment the petition was filed. *See, e.g., Watervliet Paper Co.,* 96 B.R. at 770 (where attorney was a prepetition creditor of debtor, "[n]ot only a strict reading, but ... *the only reading* of Sections 327 and 101(13) of the Bankruptcy Code render[ed the attorney] not 'disinterested' and thus ineligible for appointment.") (emphasis added); *see also In re Flying E. Ranch Co.,* 81 B.R. 633 (Bankr.D.Colo.1988); *In re Roberts,* 75 B.R. 402 (D.Utah 1987); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557 (Bankr.D.Utah 1985).

Some courts find the literal approach too confining in this regard and read the statute somewhat more flexibly. As these courts see it, under such a reading of the Code, "an attorney who merely assisted the debtor in preparing its bankruptcy petition and accompanying papers would be a 'creditor' and therefore [disqualified] because of lack of disinterestedness." *Watson,* 94 B.R. at 114. Thus, adopting a strict interpretation of an attorney as a "creditor" under § 101(13)(A) would eliminate the debtor in possession's chance of receiving legal services "except under a cash-and-carry arrangement or on a *pro bono* basis." *Martin,* 817 F.2d at 180.

In fact, the approach taken by the First Circuit in *Martin* is more plausible and practical.

> [T]he statutory mosaic must, at least, be read to exclude as a "creditor" a lawyer, not previously owed back fees or other indebtedness, who is authorized by the court to represent a debtor in connection with reorganization proceedings—notwithstanding that the lawyer will almost instantaneously become a creditor of the estate with regard to the charges endemic to current and future representation.

*Martin,* 817 F.2d at 180. If this court had to chose, it would chose the *Martin* approach to creditor status under § 101(13)(A).

However, this court need not make such a choice. Regardless of whether the word "creditor" is read literally in § 101(13)(A) or read less strictly to carve out an exception for those who assist the debtor in deciding to file and in filing the petition, Platek was a creditor of these debtors (really, of Diamond) from the day he was retained until the day he was fired. He readily admits this. He claims he was owed some $90,000 by the debtors when the petitions were filed. The claim was based on prepetition foreclosure work and perhaps some general corporate work as well. It was not based on services Platek rendered in connection with the Chapter 11 filing.

Thus, under any rational reading of § 101(13)(A), Platek was a creditor of these debtors at all times and was never disinterested.[12] It follows that Platek has not lived up to the requirements of § 327(a) that he be disinterested throughout his representation of these debtors.

#### b. *Holding or Representing an Interest Adverse to the Estate*

Unlike the term "disinterested", the term "adverse interest" is not defined by the Bankruptcy Code.[13] By judicial definition, however, "holding an interest adverse to the estate" has come to mean:

1. to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or

2. to possess a predisposition under circumstances that render such a bias against the estate.

---

12. This is not a mere technical violation of an esoteric requirement of the Bankruptcy Code. Platek's efforts to generate funds to pay his prepetition claim by misrepresenting to the state foreclosure judges the amounts of fees he was being paid by this court for his foreclosure work for these estates confirm the wisdom of the requirement that all professionals retained under § 327(a) not be prepetition creditors.

13. A narrow negative definition of adverse interest applicable only to attorneys and accountants retained by creditors' committees can be found in § 1103(b).

*In re Roberts,* 46 B.R. 815, 827 (Bankr. D.Utah 1985) *aff'd in relevant part and rev'd in part,* 75 B.R. 402 (D.Utah 1987). *See Al Gelato,* 99 B.R. at 407; *Lee,* 94 B.R. at 177; *Glenn Electric Sales Corp.,* 89 B.R. at 413; *In re Star Broadcasting, Inc.,* 81 B.R. 835, 838 (Bankr.D.N.J.1988); *Roger J. Au & Son, Inc. v. Aetna Ins. Co.,* 64 B.R. 600, 604 (N.D.Ohio 1986).

■ Since § 328(a) of the Bankruptcy Code tells professionals to neither hold nor represent an adverse interest during the period of their retention by an estate under § 327, there is a distinction between representing an adverse interest and holding an adverse interest. One who *represents* an adverse interest acts in the capacity of agent or attorney for individuals or entities *holding* such adverse interests. *BH & P,* 103 B.R. at 562; *Lee,* 94 B.R. at 177; *Star Broadcasting,* 81 B.R. at 838. During the course of his service as attorney to these debtors, Platek managed to both hold and represent interests that were adverse to those of the estates.

■ Certainly, Platek represented an interest adverse to the estate when he provided legal services to Reverend Hickman in connection with the Sanders property. Because Reverend Hickman had purchased the foreclosure judgment prior to approval by the matched investor, Platek overbid the property in Diamond's name, and this behavior clearly could have created a dispute between Hickman and Diamond if the sale fell through or was challenged; Platek's actions fall within the first prong of the *Roberts* definition of holding an adverse interest. Moreover, because Platek acted as the attorney for both Hickman and Diamond, Platek represented an interest adverse to the estate.

■ Platek held an interest adverse to that of these estates when he chose to acquire inadequate title protection in connection with a huge number of foreclosures from his office mates. In order to protect the estate against the possibility that all parties with an interest in property being foreclosed on were not properly joined in the foreclosure complaint, Platek purchased title insurance commitments that expired six months after purchase. He bought these commitments from the two lawyers he shared offices with, Locascio and DeVience, both of whom functioned at various times as agents of the entity that issued the commitments. Of course, Locascio and DeVience profited from the purchases.

It is customary in foreclosure proceedings for the foreclosing creditor to protect itself against claimants not properly joined as parties in the foreclosure by purchasing minutes of foreclosure, a form of actual title insurance. Platek did not do this. Instead, he bought options to purchase title insurance within a relatively short period. These options expired without being exercised in virtually every case leaving the estates unprotected. Platek claimed that what he had purchased was title insurance protection that was as good as what he could have obtained for these debtors had he purchased minutes of foreclosure on the open market. To support that argument, he came up with a convoluted and untested legal theory to the effect that a title report he received in connection with the issuance of the title insurance commitment protected the estate by giving it a cause of action against his office mates and the entity issuing the commitment should the title report prove erroneous.

Sliding over the merits of that theory and the obvious lack of wisdom in exposing the estate to significant potential liability based on an untested legal theory, it is clear that Platek's relationship with Locascio and DeVience gave him a predisposition to deal with them rather than purchasing a better, cheaper product from those with whom he had no relationship. He made no serious efforts to find out what minutes of foreclosure would cost on a bulk basis from the major issuer of title insurance in this area, Chicago Title and Trust ("CT & T"). The evidence is clear that he could have struck a bargain with CT & T which would have been far more advantageous to the estate and provided the estate with much more secure title protection in foreclosures than that provided by Locascio and DeVience.

However, Platek wanted to give the business to his friends. This was particularly true in the case of Locascio whom Platek had led into a most unfortunate investment with the debtors. In doing business with Locascio and DeVience, Platek's bias in their favor caused him to do things that were detrimental to the estate. The best evidence that Platek knew that what he was buying from them was not what he should have been buying for the estate was his characterization of the title insurance commitments as minutes of foreclosure in his requests for reimbursement filed with this court. They were not minutes of foreclosure, and Platek knew it. He also knew he should have been buying minutes of foreclosure, not what Locascio and DeVience had to sell. Thus, in obtaining proper title insurance for the estate, Platek had an "adverse interest" as that term is defined by the *Roberts* court. He held that adverse interest virtually throughout his service as an attorney for these estates.

### c. Sanctions under § 328(c)

It is clear that Platek violated every requirement of § 328(c) on a continuous basis during virtually the entire time he was employed by these estates. The remaining question is what sanctions are to be imposed for that violation.

■ Under prior reorganization schemes, Platek's failure to maintain disinterested status and to avoid holding or representing adverse interests may well have been fatal to any award of fees or reimbursement of expenses from the estate. See *Woods v. City National Bank and Trust Co.*, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941). That is not true under § 328(c). Section 328(c) leaves the question of what sanction, if any, is to be imposed on a professional retained by an estate who fails to live up to the requirements of that section to the discretion of the court.

■ In exercising that discretion, the court needs to balance the draconian impact of the loss of fees for services actually rendered by a professional like Platek and the denial of reimbursement of expenses actually incurred and paid by Platek in his representation of the debtor against the actual injury or prejudice to the estate from his failure to live up to the requirements of § 328(c). 2 *Collier on Bankruptcy*, ¶ 328.04[2] at 328–16 (15th ed. 1990). Also relevant is the question of whether the lawyer made full disclosure to the court of problems which might exist in meeting the requirements of § 328(c). *Al Gelato*, 99 B.R. 404.

Here Platek's failure to remain disinterested and his holding and representing adverse interests both actually injured the estates and prejudiced the estates. The debtors have already had to defend against attack by the Sanders probate estate the foreclosure judgment which resulted from the unfortunate transaction with Reverend Hickman. The debtors have had to try to solve problems with condominium associations and other parties not properly joined in foreclosure proceedings handled by Platek without the benefits that would flow from having actual minutes of foreclosure. While Platek's attempts to collect prepetition fees by inflating fee requests before state court foreclosure judges have yet to cause the debtors any actual problems, the potential for problems in the form of collateral attacks on foreclosure judgments obtained by Platek is there.

■ In sum, Platek's failure to be disinterested, his holding of adverse interests, and his representation of adverse interests coupled with his failure to disclose the same to the court until the evidence came out on the hearing on his final fee application lead to the conclusion that a sanction under § 328(c) is appropriate in this case. On the other hand, Platek did do a great deal of foreclosure work for these debtors, most of which is likely to prove valid. It would be inherently unfair to deprive him of all compensation and reimbursement because that would give these debtors a significant windfall. However, the substantial reductions ordered in this opinion are appropriate because of the serious and pervasive nature of Platek's failures in § 328(c) terms and the injury and prejudice those failures visited on the estate.

## B. THE DUTY TO DISCLOSE

 Bankruptcy Rule 2014 (both in the versions in effect at the outset of these cases and its current version as amended in 1987) requires that the application for employment disclose, *inter alia*, "all of the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants." Reading Rule 2014 in conjunction with §§ 327(a) and 328(c), it is evident that any fact which would be relevant to the court's determination of whether the professional has a conflict of interest, is not disinterested or represents an adverse interest, must be disclosed.[14] *See Lee,* 94 B.R. at 176; *B H & P,* 103 B.R. at 556; *Waterfall Village,* 103 B.R. at 346; *In re Glenn Elec. Sales Corp.,* 99 B.R. 596, 599 (D.N.J.1988); *In re Azevedo,* 92 B.R. 910, 911 (Bankr.E.D.Cal. 1988); *Roberts,* 75 B.R. at 411; *In re Porter,* 52 B.R. 692, 699 (Bankr.E.D.Va.1985).

The purpose of this disclosure requirement is to allow the court, *not* the professional to be employed, to evaluate the possibility of conflicts of interest and the potential for sanctions under §§ 327(a) and 328(c). Accordingly,

> What counts is that the matter not be left either to hindsight or the unfettered desires of the debtor and his attorney, but that the bankruptcy judge be given an immediate opportunity to make an intelligent appraisal of the situation and to apply his experience, common sense, and knowledge of the particular proceeding to the request. If a lawyer is desirous of benefiting from such an arrangement he has a responsibility to leave no reasonable stone unturned in bringing the matter to a head at the earliest practical moment.

*Lee,* 94 B.R. at 176; *Glenn Elec. Sales Corp.,* 99 B.R. at 599. In addition, compliance with Rule 2014 protects the integrity of the bankruptcy process. Full disclosure

on the part of the potential employee insures that there will be no "deleterious impact on [the] public['s] confidence" in the bankruptcy system. *Azevedo,* 92 B.R. at 911. This court does not take lightly the duty of disclosure.

However, the responsibility for compliance with Rule 2014 is solely with the applicant. The reviewing court has no duty "to search a file to determine for itself that a prospective attorney is not involved in actual or potential conflicts of interest." *Glenn Elec. Sales Corp.,* 89 B.R. at 415.

 The disclosure in the application to employ Platek is grossly deficient from any rational analysis. It shows the damages of boilerplate. Platek did not disclose that he was a prepetition creditor of the debtor, that he shared an office with Locascio and DeVience, that Locascio was a substantial creditor of the debtor, and that he purchased title insurance commitments for Diamond from Locascio and DeVience. Had Platek made these disclosures, there is a strong likelihood he never would have been employed. He must now live with the consequences of that failure to disclose.

## II. AMOUNT OF FEES AND EXPENSES TO BE ALLOWED

 As previously stated, § 328(c) vests the court with authority to deny fee requests in whole or in part. This authority is discretionary in nature because the statute uses the word "may" and not "must" or "shall". In this regard, "courts considering the matter have adopted a flexible approach under § 328(c) where 'the need for attorney discipline is outweighed by the equities of the case.'" *In re Porter,* 52 B.R. at 700 *quoting Roberts,* 46 B.R. at 848. *See Matter of Roger J. Au & Son, Inc.,* 71 B.R. 238, 241 (Bankr.N.D.Ohio 1986); *PHM Credit Corp.,* 99 B.R. at 766;

---

**14.** The pre–1987 version of the Rule required the party seeking to employ the professional to make the disclosure. The current version of the Rule requires disclosure by both the party seeking to employ the professional and the professional to be employed. The distinction is not significant. Here Platek, at a minimum, should have made full disclosure to the debtors who, in turn, should have made full disclosure to Judge McCormick. Platek should have reviewed the complaint to employ him and declined the employment if full disclosure was not made to the court.

*In re Watson Seafood & Poultry Co.,* 40 B.R. 436, 444 (Bankr.E.D.N.C.1984).

■ This is a clear case of the need for attorney discipline outweighing the equities of the case. First, the fact that Platek had conflicts of interest is, in and of itself, sufficient reason for this court to deny or reduce Platek's fee request. *In re WPMK, Inc.,* 42 B.R. 157, 163 (Bankr.Haw.1984) ("the approval or denial of compensation has hinged upon whether or not the attorney was placed in a position of being required to choose between conflicting duties and interests"); *Marine Power & Equipment Co.,* 67 B.R. at 653; *Inslaw, Inc.,* 97 B.R. at 703 ("this Court has the authority to deny counsel fees in their entirety, if it determines at any time during the course of representation the existence of a conflict of interest on the part of counsel representing the debtor").

■ Second, the fact that Platek was not disinterested and the fact that Platek represented an interest adverse to the estate are, in and of themselves, sufficient grounds upon which to reduce or deny Platek's fees. *See Porter,* 52 B.R. at 699 ("Section 328(c) of the Bankruptcy Code allows the court to deny compensation to an individual employed under § 327 if at any time during such person's employment, that person is found to be not disinterested or represents ... an adverse interest to the estate with respect to the matter on which such person is employed.")

■ The fact that Platek failed to disclose all the facts necessary for the court to make an informed decision regarding his employment is again a sufficient basis for reduction or denial of fees. Simply put, when a professional fails to disclose relevant information, "the attorney performs services at his peril." *In re Coastal Equities, Inc.,* 39 B.R. 304, 308 (Bankr.S.D.Cal. 1984). *See Glenn Electric Sales Corp.,* 99 B.R. at 600; *In re Guy Apple Masonry Contractor, Inc.,* 45 B.R. 160, 163 (Bankr. D.Ariz.1984); *Marine Power & Equip. Co.,* 67 B.R. at 648 ("Lack of disclosure of relevant information necessary for an informed ruling on a debtor's application for the employment of an attorney is grounds for the denial of a fee application.").

The court has ample justification for denying Platek's fee request entirely. However, because Platek's services proved to be of some benefit to the estate, only a 60% reduction in fees and other reductions previously noted are appropriate. *See, e.g., Kendavis,* 91 B.R. 742 (50% reduction); *Roger J. Au & Son,* 71 B.R. 238 (law firm employed by estate entitled to "some" compensation).

### Platek's Fee Application

In an attempt to comply with local practice, Platek's application divides his services into categories with the cost to the estate of such services. *See In re Continental Illinois Sec. Litigation,* 572 F.Supp. 931 (N.D.Ill.1983); *In re Chicago Lutheran Hospital Ass'n,* 89 B.R. 719 (Bankr. N.D.Ill.1988); *In re Wildman,* 72 B.R. 700 (Bankr.N.D.Ill.1987). Such a presentation greatly facilitates the court's analysis of fee applications in significant bankruptcy cases. Here, the billing categories and the amounts sought by Platek for each category are as follows:

| Schedule | Fees and Expenses | Amount Requested |
|---|---|---|
| A. | General Counsel | $ 25,411.50 |
| B. | Matched mortgages | $ 21,946.50 |
| C. | Costs | $117,267.05 |
| D. | Unmatched Foreclosures | $145,134.00 |
| E. | Retainers received | $144,499.95 |
| F. | "Gap Period" Fees | $ 8,891.01 |

The general rule is that the costs of administration of the estate and attorney fees for services rendered to the debtor in possession are charged against the estate. *In re Korupp Associates, Inc.,* 30 B.R. 659 (Bankr.D.Me.1983). Bankruptcy Rule 2016(a) requires that any person who seeks an award of compensation from the estate must file an application for compensation with the court, detailing the services rendered, the time spent, and any expenses for which reimbursement is requested. The burden of proving the value of the services for which compensation is sought is always on the applicant. *In re Pettibone Corp.,* 74 B.R. 293, 299 (Bankr. N.D.Ill.1987). This burden is not to be taken lightly, as "every dollar expended on legal fees results is a dollar less that is available for distribution to the creditors." *In re Hotel Associates, Inc.,* 15 B.R. 487, 488 (Bankr.E.D.Pa.1981).

The ultimate question in the proceeding before the court is the amount of compensation that Platek has earned in this case. Even if no objections are raised to a fee request, the bankruptcy court is not bound to award the fees sought, and in fact has a duty to independently examine the reasonableness of all fee applications. *In re NRG Resources, Inc.,* 64 B.R. 643, 650 (W.D.La.1986); *Pettibone,* 74 B.R. at 299–300. Here, of course, the Creditors' Committee and the U.S. Trustee raise serious questions about the amount of compensation to be awarded Platek. The Court has conducted extensive hearings on those objections and a great deal of evidence has been adduced by both sides.

Bankruptcy Rule 2016, which governs compensation for services and expenses, sets forth the information which must appear in a fee application. That information includes: "[A] *detailed* statement of ... the services rendered, time expended, expenses incurred and ... the amounts requested." Bankruptcy Rule 2016 (emphasis added). In all fee requests, the fee application is the starting point for analysis, as "the primary objective of any fee petition is to reveal sufficient information to enable the Court to determine whether the services rendered were reasonable, actual and necessary." *Jensen–Farley Pictures, Inc.,* 47 B.R. at 582. "An attorney applying for fees is obligated to provide accurate and detailed records for the services for which he/she seeks reimbursement." *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 840 F.2d 1308, 1318 n. 7 (7th Cir.1988).

This Court has previously assembled detailed criteria to be followed in analyzing a fee application such as that submitted by Platek, and will not repeat those standards here. *See Chicago Lutheran Hospital Ass'n,* 89 B.R. at 735–736.

In determining the extent and value of compensation to be awarded, courts generally follow the "lodestar" approach, the *"Johnson"* approach, or some combination of the two. The lodestar approach, first applied by the Third Circuit in 1973, determines the amount of compensable time and then multiplies that amount by an appropriate hourly rate to obtain the base or "lodestar" figure. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 166–168 (3rd Cir.1973) ("Lindy I"). The lodestar figure may be adjusted upward or downward, depending on the facts and circumstances of the case.[15] *See, e.g., Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980); *Wildman,* 72 B.R. at 712; *In re Casco Bay Lines, Inc.,* 25 B.R. 747 (Bankr. 1st Cir. 1982). The *"Johnson"* approach, first set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974), enumerates 12 factors to be considered by the court in awarding adequate compensation.[16] These factors are based

---

**15.** These facts and circumstances include, *inter alia,* the degree of success of the case, *see In re Garland Corp.,* 8 B.R. 826 (Bankr.D.Mass.1981), and any unique contribution by the lawyer to the success or failure of the case.

**16.** These 12 factors are as follows:

(1) The time and labor required.
(2) The difficulty and novelty of issues involved.

**100**

on the standards for fees for legal services set forth in the Model Code of Professional Responsibility, DR 2-106. *Pettibone,* 74 B.R. at 305-06. However, in reviewing Platek's application, the Court will limit his compensation to $450 per foreclosure as previously ordered, and not the $45 per hour rate that he seeks.

This Court has reviewed Platek's application in detail in light of all of the foregoing. The application and accompanying time records are voluminous, running several hundred pages. While the description of services rendered by Platek arguably lacks the detail ideally required for compensation in bankruptcy, on an overall basis the court believes it is able to determine from the application, as amended in accordance with this court's instructions, generally what Platek did and how long it took him to do it. While Platek's fee application is far from perfect in terms of content, awards are not a game where the applicant who fails to jump through every hoop loses.

■ What remains to be done is to determine Platek's lodestar amount. At various times during the course of the administration of this estate, Platek was retained on the basis of $450 per foreclosure case handled for Diamond. At other times he was retained to handle foreclosures at a rate of $45 per hour. The lodestar in this situation is the sum of the $450 flat fee times the number of foreclosure cases Platek handled for Diamond during the course of the administration of this estate plus the number of additional hours he reasonably spent on other foreclosures times the agreed upon hourly rate of $45. Platek claims a lodestar of $31,350 for the flat fee work, and a lodestar of $211,351.50 for 4696.7 hours spent on hourly work for a total lodestar of $242,701.50. Neither the Committee nor the U.S. Trustee has challenged this amount other than requesting a

reduction of 19 hours for time spent stripping files to be turned over to the estate after Platek was fired, and the court will accept this amount. However, the 19 hour reduction will be imposed on Platek as the stripping of the files was improper and injured rather than benefited the estate. Platek will be allowed final compensation of 40% of the lodestar amount reduced by 19 hours, 40% of $241,846.50, i.e., $96,738.60, as final compensation for services rendered to the estate. To make the basis of this award in lodestar terms, Platek's lodestar is not being reduced on the basis of the quality of services rendered. It is true that many of the services rendered by Platek were of questionable value. Many foreclosure files lack properly recorded deeds. He often left the estate with illusory, inadequate title insurance. Some of his activities, such as bidding in excess of the amount of Diamond's foreclosure judgment at Sheriff's sales or claiming fees in state court foreclosure proceedings in excess of those authorized to be paid by this court reflect a basic misunderstanding of Illinois foreclosure law.

■ Nevertheless, no reduction of Platek's fee because of the quality of services rendered is warranted in this case. That is true only because Platek is already being compensated at well below market rates. The $450 flat fee for a foreclosure is (and was when that arrangement was in effect) well below what the reorganized debtor now pays (and would have had to pay then) other counsel for such services. The $45 hourly rate is closer to what has commonly been charged for paralegal services rather than lawyer's services in Chicago during the relevant time period. It might be said that in determining the quality of services Platek rendered in this case, the estate got what it paid for.

(3) The skill required to properly perform the services.
(4) Whether employment in the case precluded acceptance of other employment opportunities.
(5) The customary fee for the services.
(6) The time constraints imposed by the trustee or the circumstances of the case.
(7) Whether the fee is contingent.

(8) The amounts involved and degree of success.
(9) The experience, reputation and ability of the professional.
(10) The unattractiveness of the case.
(11) The nature and length of the relationship between the professional and the trustee.
(12) The amount of compensation allowed similar professionals in similar careers.

The 60% reduction in Platek's fees is on account of his failure to disclose to this court and its predecessors his status as a prepetition creditor and his intention to pursue that claim,[17] the failure to disclose the relationship with Locascio and DeVience, the involvement with Reverend Hickman, the misrepresentation of allowable fees to the state court, and his affirmative noncooperation with representatives of the debtor after his termination as an attorney for the reorganized debtor. It is true, as urged by the Committee, that these activities could justify a total denial of fees to Platek. See *In re XGW Excavating Co.,* 111 B.R. 469, 472 (Bankr.D.N.J.1990) (quoting *In re South Pac. Island Airways,* 68 B.R. 574, 578 (Bankr.D.Haw.1986)), *Roger J. Au & Son,* 71 B.R. 238. However, the court is satisfied that most of the numerous foreclosures Platek handled for Diamond during this reorganization case will stand up; and thus the estate benefited from Platek's services. In light of this fact, a 60% reduction in fees is fair and should suffice to sanction Platek and deter others from similar activity.

It is unfair to reduce reimbursement of Platek's expenses by 60%. There is no doubt he incurred those expenses for Diamond and Diamond benefited from those expenses, other than those incurred buying the useless title protection from Locascio and DeVience. All expenses incurred in purchasing title protection from Locascio or DeVience will be disallowed; and Platek's request for reimbursement will be reduced by $20,631.

Counsel for the Committee is requested to prepare and submit a judgment order in accordance with the foregoing.

---

17. While this court does not have before it any action with respect to that claim, it would seem that Platek's prepetition claim ought to be disallowed or equitably subordinated and all amounts he has collected on that claim refunded with interest to the estate (or set off against the amounts allowed in this opinion). The record in this proceeding clearly supports such a result.